83 N.J. Super. 545 (1964)
200 A.2d 532
BEATRICE EBERT AND CASIMIR EBERT, HER HUSBAND, PLAINTIFFS,
v.
LEON I. BALTER, DEFENDANT AND THIRD-PARTY PLAINTIFF,
v.
ALLSTATE INSURANCE COMPANY AND STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, THIRD-PARTY DEFENDANTS.
Superior Court of New Jersey, Union County Court, Law Division.
Decided April 30, 1964.
*548 Mr. Steven Wise for third-party plaintiff (Mr. Leo Kaplowitz, attorney).
Mr. William J. Murray for third-party defendant State Farm Mutual Automobile Insurance Company.
HOPKINS, J.C.C.
Third-party plaintiff, a defendant in an automobile accident case, seeks judgment against third-party defendant State Farm Mutual Insurance Company (hereafter referred to as State Farm) for damages. He requests that State Farm be ordered to pay all counsel fees and costs incurred by him, allegedly because State Farm withdrew from the defense of the automobile negligence suit. Balter also asks that State Farm be required to pay the judgment rendered against him in favor of the original plaintiff Ebert. Although the facts developed at the hearing were substantially the same as those recited in the Appellate Division opinion at 74 N.J. Super. 466 (1962), it is necessary, in view of the circumstances and my disposition of this case, to repeat and elaborate upon them somewhat.
Balter had an automobile liability insurance policy with Allstate Insurance Company (hereafter referred to as Allstate) that expired at midnight on January 16, 1957. On *549 January 14, 1957, he contracted for such a policy from State Farm to be effective at 12:01 A.M. on January 17, 1957  that is, upon the expiration of the Allstate policy.
At approximately 4 P.M. on January 16, 1957 he was involved in a minor automobile accident with an automobile operated by Mrs. Ebert. Only slight property damage and no personal injuries were noted at the time. Both parties left the scene without exchanging any credentials or making any report. A week or less after the accident Balter received a telephone call from Mr. Ebert advising that Mrs. Ebert had been injured in the accident. Immediately thereafter Balter, erroneously believing the date of the occurrence to have been January 17, went to the State Farm office and reported the details of the accident to its agent. In truth, since the accident occurred on January 16, Balter's coverage was with All-state.
After receiving Balter's report of the accident State Farm assigned the matter to one of its claim adjusters, Donald Julian. He examined the accident report and on February 26, 1957 interviewed Balter and obtained a signed statement from him concerning the details of the accident. This statement again fixed the accident on January 17. The investigating claims adjuster also obtained a non-waiver agreement from Balter which reads (hand-written matter is enclosed in parentheses  remainder is printed form):

"AUTHORIZATION FOR CLAIM SERVICE AND NON-WAIVER OF RIGHTS
The undersigned requests and authorizes STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY to investigate, negotiate, settle, deny or defend any claim arising out of an accident occurring on or about ____ (1/17/57) ____ 19__.
It is agreed that such actions shall not waive any of the rights of the undersigned or of the Company under any contract of insurance. Dated at ____ (4:00 P.M.) ____ this ____ (27)____ day of ____ (Feb.) ____ 19__ (57) ____.
 (Leon Balter)
 _____________________________________
 Signature
 _____________________________________
 Signature"
*550 Julian stated that upon taking this non-waiver agreement he told Balter "that the reason for this [non-waiver], of course, was that the home office hadn't notified me that the policy was in force and because of that fact I would take the non-waiver." The reason Julian had not received notice of coverage from State Farm's home office was that Balter had only recently taken out his policy and the application had probably not been processed by the home office.
Meanwhile, State Farm received a letter dated February 6, 1957, from Eberts' attorney. This letter, directed to the attention of Julian, fixed the accident as occurring "on or about January 16, 1956." The year 1956 was in error but the 16th day of January was correct. Julian saw this letter and contacted the attorney. However, although he investigated the case until he was relieved by another State Farm investigator in March or April 1957, Julian did not do anything with reference to verifying the date of the accident, other than the taking of the statement of the details of the accident from Balter.
When Balter received his formal policy from State Farm, the agent sent a covering note that stated: "Don't worry about that small claim. Nothing will come of it." A few months after making the initial report of the accident to State Farm, Balter inquired on two separate occasions as to the status of the claim. The agent told him that he was "an old worry wart, that nothing will come of it, to go home and forget it," and assured him that "everything was O.K. Leave it to us."
Approximately 23 months after the accident the Eberts instituted suit against Balter seeking damages. The complaint alleged that the accident occurred on or about January 16, 1956. Balter was served on December 29, 1958, and on the next day delivered the papers to Frank Rutkosky, the State Farm claim adjuster who relieved Julian in investigating this claim. Rutkosky told Balter that such things happen every day and that he should "Take it easy. This is going to take time. You are going to have to live with this awhile." When *551 Balter informed Rutkosky that he had contacted his own attorney, Rutkosky replied: "Well, you could if you want to, but it isn't necessary."
On January 19, 1959 William J. Murray, the attorney for State Farm, filed an answer to the complaint. This answer recognized that the date of the occurrence was January 16, 1957 and not 1956, as alleged in the complaint. State Farm, on behalf of Balter, propounded interrogatories to the plaintiff Eberts on January 15, 1959. Two of the answers, which apparently were not received until March 24, 1959, state that the date of the accident was January 16, 1957. Subsequently on July 14, 1959, State Farm took the deposition of Mrs. Ebert. Again, January 16, 1957, was declared to be the date of the accident.
On August 3, 1959 Balter, at the request of State Farm, visited the office of Murray. As a result of this meeting, Balter realized that he was mistaken as to the date of the accident. He signed a statement that the accident did occur on January 16, 1957. Murray then advised Balter that in view of the established fact that the accident occurred the day before his State Farm policy became effective, State Farm was withdrawing from the case. This withdrawal was confirmed by a September 10, 1959 letter from State Farm to Balter.
After leaving Murray's office on August 3, 1959, Balter went directly to the office of his personal attorney. This attorney telephoned Allstate on August 11, 1959 and notified that company of the accident. The Superior Court, Appellate Division, has held that Allstate was not required to defend or pay any judgment since Balter had failed to comply with the "as soon as practicable" notice of accident provision of the Allstate policy. 74 N.J. Super. 466.
Returning to the pertinent facts of the instant proceeding, Murray was permitted by court order to withdraw as Balter's attorney on October 26, 1959. Thereafter Balter's personal attorney took over the defense of the automobile accident case. After a two-day jury trial in October 1961 the jury returned a *552 verdict of no damages for Mrs. Ebert and an award of $750 for medical expenses to Mr. Ebert. However, upon their motion a new trial was granted. This second trial resulted in a hung jury. Finally, after a two-day jury trial in January 1964 judgment was entered in favor of the Eberts for the sum of $1,800 and costs.
Balter contends that State Farm is liable for the expenses of defending the suit and for the judgment. He claims that State Farm negligently investigated and undertook the defense and therefore is estopped to deny liability. He asserts that State Farm, which had exclusive control over the defense of the automobile accident action, was early put on notice that a question as to the date of the accident existed. He maintains that this notice required State Farm to make diligent inquiry to determine the correct date and to notify the insured seasonably. Balter argues that waivers such as he signed should be strictly construed against insurers; here, he urges, the agreement should be limited to the waiver of rights held under the policy, and not to waive any rights by estoppel under the facts of this case.
State Farm stresses the fact that no insurance policy was in effect at the time of the accident. Noting that it was required under the policy to defend Balter even if the suit was groundless, it argues that it is not estopped to deny liability because of the reservation of rights by the non-waiver agreement. Further, State Farm asserts it was not negligent in conducting the investigation and defense. Claiming that it could not have learned the exact date of the accident any earlier than it did, State Farm insists that the only gap in the investigation was caused by Balter himself. The company states that even if it were negligent in handling the instant claim, that fact is immaterial since there is no showing that it acted in bad faith. The parties concede the good faith of each other.
I deal initially with the issue of whether State Farm was in fact negligent in its investigation and defense of the claim. The negligence claim is predicated on the allegation that State Farm failed to investigate properly in order to determine *553 whether or not the loss was one for which it was liable under the policy.
The terms of the policy constitute the measure of the insurer's liability, in the absence of an estoppel or waiver on the part of the company. Neilson v. American Mutual Liability Insurance Co. of Boston, 111 N.J.L. 345, 348 (E. & A. 1933). A carrier is bound to defend all actions that are brought against the insured that are covered by the policy. Goldmann v. Lumber Mutual Casualty Insurance Co. of N.Y., 30 N.J. Super. 281, 286 (Cty. Ct. 1954). The allegations of the complaint must state a cause of action within the coverage of the policy in order for the duty of the insurer to defend to arise. Danek v. Hommer, 28 N.J. Super. 68, 77 (App. Div. 1953), affirmed per curiam 15 N.J. 573 (1954); Note, 38 Geo. L.J. 319 (1950); 7A Appleman, Insurance Law and Practice, sec. 4683, p. 436 (1962); 3 Richards, Law of Insurance, sec. 421, p. 1391 (1952). The reasoning is that the insurer's duty to defend is ordinarily correlative with its duty to pay judgments obtained against the insured. Merchants Indemnity Corp. of N.Y. v. Eggleston, 37 N.J. 114, 127 (1962); Miller v. Motor Club Insurance Co., 117 N.J.L. 480, 482 (E. & A. 1937); Goldmann v. Lumber Mutual Casualty Co. of N.Y., supra, 30 N.J. Super., at p. 286.
Broadly speaking, an insurer who, with knowledge of the facts, assumes and conducts the defense of an action outside the coverage of the policy, cannot later disclaim liability by establishing the non-coverage. Cook v. Preferred Accident Insurance Co., 114 N.J.L. 141, 144 (E. & A. 1935). However, the insurer, having a duty to defend even groundless suits, has an immediate right and duty to make such investigation as is reasonably necessary to determine the facts in connection with the claim as well as any possible defense. Such an investigation does not waive any defense the insurer might have under the policy. Kloidt v. Metropolitan Life Insurance Co., 18 N.J. Misc. 661, 672, 16 A.2d 274, 279 (Sup. Ct. 1939). The carrier must seek the facts with reasonable diligence and make its determination to perform or *554 withdraw from the action within a reasonable period under the circumstances. Merchants Indemnity Corp. of N.Y. v. Eggleston, 37 N.J. 114, 131 (1962); O'Dowd v. United States Fidelity & Guaranty Co., 117 N.J.L. 444, 451 (E. & A. 1937); 7A Appleman, Insurance Law and Practice, sec. 4693, p. 529 (1962). In the absence of fraud, an insurer who, because of its own negligence, is ignorant of the facts that constitute non-coverage, cannot later disclaim liability. Thus, where the carrier has information sufficient to put it on inquiry and it has the means of obtaining the facts, it may carelessly assume to remain in charge of the case. An insurer who so undertakes a defense is estopped to deny liability even though the scope of the undertaking between the insurer and the insured is thereby extended beyond the policy. O'Dowd v. United States Fidelity & Guaranty Co., 117 N.J.L. 444, 451 (E. & A. 1937); Caiola v. Aetna Life Insurance Co., 13 N.J. Misc. 845, 847-848, 181 A. 524, 525 (Sup. Ct. 1935), affirmed 116 N.J.L. 381 (E. & A. 1936); Scrafino v. United States Fidelity & Guaranty Co., 122 N.J.L. 294, 300 (Sup. Ct. 1939). In this respect, the broad general doctrine that a loss not within the policy coverage may not be brought within the coverage under the principle of estoppel, does not apply. Compare, Goldberg v. Commercial Union Insurance Co. of New York, 78 N.J. Super. 183, 191-192 (App. Div. 1963); 16 Appleman, Insurance Law and Practice, sec. 9090, p. 628 (1963).
In accordance with these principles, I find that State Farm was negligent in its investigation and defense of the claim. State Farm failed to exercise due care and ordinary diligence in determining the date of the accident. The assertion that the exact date of the accident could not have been discovered and brought to the attention of Balter any earlier than August 3, 1959 is not, in any degree, supported by the facts. It is not denied that Balter, although he initiated the erroneous date which led the company to undertake the defense, gave State Farm sufficient facts to make an investigation.
*555 It would seem contrary to human experience and good carrier practice that the insurer would not be alert as to the accuracy of the date of an accident which allegedly occurred on the first day of coverage. But more than this, there were ample facts and circumstances to raise suspicions to put the company on particular inquiry concerning the accident's date. Balter, reasonably believing the incident to have been a minor one from which no claim would arise, did not notify the company until a few days after the accident. The letter of February 6, 1957 to State Farm from the Eberts' attorney set the date of the accident as "on or about January 16, 1956." The company urges that without a police report or record it could not verify the accident date. It insists that the phrase "on or about January 16" cannot be found to have raised a question concerning the date of the accident because that phrase has been construed to include reasonable periods before and after the stated date. But even so, a letter making claim regarding an accident occurring "on or about January 16, 1956" certainly should have alerted it when it knew or should have known its policy did not commence until January 17, 1957.
It is true that police records of accidents are a convenient source for checking details of accidents. Also, State Farm correctly states the interpretation of the frequently used phrase "on or about." However, the basic problem here is whether, under the facts and circumstances of the claim, State Farm had received sufficient information to put it on inquiry as to the date of the accident. It is fair to infer that the insurer should have suspected a possible mistake concerning the date, and that with a reasonably diligent investigation it could have discovered the true date. The absence of a police report does not excuse diligence  usually it will require greater perseverance. The company had contacted the Eberts' attorney but did not question or discuss the date. It should have in view of his letter received near the beginning of its investigation.
Further, when State Farm's investigator interviewed and took a statement from Balter in late February 1957, he did *556 not raise any questions as to the accuracy of the date. I note that although Balter consistently fixed January 17 as the accident date, he was never questioned as to the accuracy of that date nor confronted with any conflicting statement until August 3, 1959. This is so even though the complaint filed in December 1958 set the date as "on or about January 16, 1956." State Farm acknowledges that it knew the year 1956 to be in error, and its answer, filed in January 1959, accurately represents the date as January 16, 1957. Thus, the company assumed the defense of Balter although neither the complaint nor the answer stated a cause of action within the effective date of the policy. The correct date of the accident was again presented to State Farm in answers to interrogatories received on March 24, 1959. Yet, the company sat back and waited until after the July 14, 1959 deposition of Mrs. Ebert had again set the date as January 16 before it decided to withdraw and called the conflicting dates to the attention of Balter. The record discloses that after the interrogatories were received and before the deposition was taken the company continued actively to defend by filing a demand for medical reports made of Mrs. Ebert and a motion to compel more specific answers to some of the interrogatories (but not the two answers that gave the accident date).
A few weeks after the taking of this deposition, the company first notified Balter that the date was being questioned. There is no indication Balter ever informed the company that he was certain that January 17 was the correct date. In fact, when confronted with the conflicting dates for the first time on August 3, 1959, Balter signed a statement admitting the accident occurred on January 16.
It is difficult to determine whether the insurer did not know the date or whether it failed to realize the significance of the date until August 3, 1959. However, it is clear that the company either failed to investigate with ordinary diligence or, upon learning the true date, failed to notify Balter promptly in order that he could take charge of the defense. If State Farm had sought the facts with reasonable diligence, it could *557 have early determined the date and then notified Balter of the non-coverage and withdrawal. Here the company ousted Balter from the control and defense of the suit for a period of 31 months. It is enough to say that it would be unfair to permit an insurer who maintained complete control of a case when it knew, or should have known, that the claim was not covered by the policy, to hold the insured within its tender mercy as to when and if it would set up the defense of non-coverage. As stated by Justice Heher in New Jersey Suburban Water Co. v. Town of Harrison, 122 N.J.L. 189 (E. & A. 1939):
"* * * equitable estoppel and estoppel in pais are convertible terms, embracing also quasi-estoppel. They embody the doctrine, grounded in equity and justice, that one shall not be permitted to repudiate an act done or position assumed where that course would work injustice to another who, having the right to do so, has relied thereon. An estoppel arises `where a man is concluded and forbidden by law to speak against his own act or deed; yea, even though it is to say the truth.' Termes de la Ley, tit. Estoppel, cited in Demarest v. Den ex dem. Hopper, 22 N.J.L. 599, 619. It is operative where a person `has done some act which the policy of the law will not permit him to gainsay or deny.' 1 Greenleaf on Evidence (16th Ed.) c. VI, Sec. 22. See, also, Blackstone's Com. 308. While the creature of equity, and governed by equitable principles, it is a doctrine enforceable in courts of common law jurisdiction. LaRosa v. Nichols, 92 N.J.L. 375; Central R. Co. [of New Jersey] v. MacCartney, 68 N.J.L. 165. It is of the essence of equitable estoppel that one is precluded from taking a position inconsistent with that previously assumed and intended to influence the conduct of another, if such repudiation `would not be responsive to the demands of justice and good conscience,' in that it would effect an unjust result as regards the latter. Rothschild v. Title Guarantee and Trust Co., 204 N.Y. 458, 97 N.E. 879; 41 L.R.A., N.S., 740." (22 N.Y.S., at p. 194)
As previously detailed, Balter signed a non-waiver agreement on February 27, 1957 which authorized the carrier to investigate, negotiate, settle, deny or defend the accident claim without waiving its rights under the insurance contract. State Farm contends it thus used the classic method of reserving its liability while it defended the claim. Of course, the *558 self-evident purpose of a non-waiver agreement is to avert the operation of the usual rules of waiver and estoppel. The carrier submits that the execution of this agreement by Balter less than six weeks after the date of the accident clearly placed him on notice that he should have reported the accident to Allstate rather than State Farm.
"Waiver," a loosely used term that embraces a number of concepts, involves an intentional and voluntary relinquishment of a known right. Merchants Indemnity Corp of N.Y. v. Eggleston, 37 N.J. 114, 130-131 (1962). It generally presupposes a full knowledge of the right and cannot be predicated on consent given under a mistake of fact. West Jersey Title & Guaranty Co. v. Industrial Trust Co., 27 N.J. 144, 152-153 (1958). The basic facts surrounding Balter's signing of this waiver show that he was informed by State Farm's investigator that the reason for the agreement was that the home office, because the policy was so new it had not been fully processed, had not notified him that the policy was in force. Neither the waiver agreement nor the surrounding conversation advised Balter that the date of the accident was in question. Under the circumstances, there is no need to apply the canons of strict construction designed to resolve doubts against the insurer. The agreement does not, in my opinion, reasonably notify the insured that the carrier was reserving its right concerning non-coverage on a question as to the date of the accident. See Zisko v. Travelers Insurance Co., 117 N.J.L. 366 (E. & A. 1937). No matter what the carrier's uncommunicated intention, it had a duty to speak and explain its position to the insured.
To the chagrin of both insurer and insured, the fact that insurance contracts at times include traps for the "uninitiated" is a source of frequent jest. This agreement didn't really afford the insured the choice implicit in a non-waiver  such as his right to take control of the defense and to refuse to cooperate with the insurer. Good faith, the essence of insurance contracts, "demands that the insurer deal with laymen as laymen and not as experts in the subtleties of law and *559 underwriting." Merchants Indemnity Corp. of N.Y. v. Eggleston, 37 N.J. 114, 122 (1962). Here, the insured should have been fairly informed in understandable terms of his rights. In view of the volume of litigation concerning waivers, it is justifiable to infer that carriers are keenly aware of the shield afforded by these agreements. However, whether based on such considerations as good faith or public policy, courts will not permit these standard form agreements to be used as a sword against an unknowing and unsuspected insured. It would not have been difficult for the carrier to have framed a non-waiver or disclaimer that would have clearly and unmistakenly informed the insured of its position. Compare the instant agreement with the disclaimer set out in Neilson v. American Mutual Liability Insurance Co., 111 N.J.L. 345, 349 (E. & A. 1933).
Other observations should be made with respect to the effect of the non-waiver agreement here involved. First, it is difficult, in the context of this claim, to grasp State Farm's contention that on February 27, 1957 Balter was put on notice of non-coverage by the execution of the agreement while, on the other hand, it contends it could not have reasonably discovered and notified Balter of the correct accident date until August 3, 1959, approximately 31 months after the accident. But even accepting, arguendo, the assertion that the execution of the agreement placed Balter on notice as to non-coverage here relied upon, my opinion is that State Farm waived such a right by its subsequent conduct. A non-waiver agreement may be waived as well as any other provision in an insurance contract. 45 C.J.S. Insurance § 676, p. 622. The facts indicate that Balter was repeatedly assured by the carrier that the claim was being taken care of and that he should not worry. Even when the litigation began, a company representative told Balter that it wasn't necessary for him to contact his own attorney. Whether the carrier was negligent or decided that it would be good business policy to defend the case is immaterial. If it was the intention of State Farm to claim the policy did not cover the accident, its duty was to *560 have promptly notified Balter of that ground so he could have taken charge of the defense. The facts show that after the execution of the non-waiver agreement the company repeatedly maintained control of the case and assured the insured that his interests were being protected and that he need not take any personal action. This activity was certainly inconsistent with the carrier's present interpretation of the waiver. On the entire record, State Farm's reliance upon this agreement as a reservation of the non-coverage defense here asserted is barred.
In short, State Farm assumed its duty to investigate on an allegation which placed the accident within the coverage of the policy. Due to some doubt that a policy was in effect, the investigator secured from the insured a non-waiver agreement reserving its rights under the policy. In view of the particular facts and circumstances presented, State Farm is precluded from asserting this agreement as a reservation of the non-coverage defense here presented. Owing to its failure to diligently investigate, or its disregard of the facts, State Farm failed to discover or disclose the grounds for non-coverage for a period of approximately 31 months. Further, although neither the complaint nor answer stated a cause of action covered by the policy, the company continued in control of the litigation for a period of at least seven months. The record discloses that even after the interrogatories taken of the Eberts set the date as January 16, 1957, the company continued the defense and filed two motions.
Defense of a lawsuit carries with it definite responsibilities. The carrier's undertaking to defend the insured may be greatly disadvantageous to the insured if he must abandon complete control of the claim to the company and yet be liable for any judgment. As Chief Justice Weintraub wrote in Merchants Indemnity Corp. of N.Y. v. Eggleston, supra:
"Control of the defense is vitally connected with the obligation to pay the judgment. Carriers contract for control, and to that end require notice of accident and prompt submission of suit papers. Success, absolute or relative, may depend upon skill in investigation, *561 in negotiations for settlement, and in the conduct of the lawsuit. Just as a carrier would hardly agree to pay a judgment after defense by the insured, so it cannot expect the insured to pay for a judgment when it controlled the litigation. A carrier may be more confident of its handling of claims, but an insured may with equal conviction prefer the individualized attention of his own counsel as against the services furnished by an insurer in the mass-handling of litigation. Personal counsel may seize opportunities to settle which might be ignored or overlooked by a carrier to which the case is just one of a great number. Moreover, whatever his estimate of lawyers in general, a man usually has faith in my lawyer. This intangible is a valuable right.
For these reasons it would be unfair to permit a carrier to control the defense without the consent of the insured and then leave the judgment for his payment. The policy does not authorize that course. Control of the defense is coupled with the duty to pay. The carrier cannot sever them by its unilateral action. Hence we are satisfied that if a carrier wishes to control the defense and simultaneously reserve a right to dispute liability, it can do so only with the consent of the insured. As we have said, an agreement may be inferred from an insured's failure to reject an offer to defend upon those terms, but to spell out acquiescence by silence, the letter must fairly inform the insured that the offer may be accepted or rejected." (37 N.J., at pp. 127-128)
State Farm, having failed to inform Balter of the non-coverage until it had assumed and continued the investigation and defense for a period of approximately 31 months, must suffer the consequences resulting from its withdrawal.
Balter was required to retain his personal attorney and now seeks to recover the reasonable expenses of the three trials of the automobile negligence action and the amount of the judgment obtained against him by the Eberts. For the reasons above stated, I have concluded that he is entitled to this relief. Although generally a litigant must pay his own counsel fees, it is well settled that an insurance carrier's unjustifiable refusal to defend renders it liable for the reasonable and necessary expenses incurred by the insured in defending the claim. 29A Am. Jur., Insurance, sec. 1460, p. 571. Allowance of attorney's fees in such a situation is in reality only a reimbursement of expenses. Cf. Vargas v. A.H. Bull Steamship Co., 25 N.J. 293, 296 (1957), certification denied 355 U.S. 958, 78 S.Ct. 545, 2 L.Ed.2d 534 (1958).
*562 He also requests that State Farm pay for the costs of this declaratory judgment litigation, including the appeal. This request is denied. Although I agree that Balter's declaratory judgment expenses would not have been incurred but for State Farm's breach of duty in withdrawing from the defense, it is settled law that in the absence of a rule, statute, contract, or other recognized ground, the costs of enforcing a claim is not one of the elements of recovery. City of Englewood v. Veith Realty Co., Inc., 50 N.J. Super. 369, 377 (App. Div. 1958); Milwaukee Mechanics Insurance Co. v. Davis, 198 F.2d 441 (5 Cir. 1952); Inland Mutual Insurance Co. v. Hightower, 274 Ala. 52, 145 So.2d 422, 431 (Sup. Ct. 1962); 7A Appleman, Insurance Law and Practice, sec. 4691, p. 512 (1962).
The amount of counsel fees to award is a difficult and delicate matter to decide. There is no fixed guide to evaluate the work and to award a reasonable fee under the circumstances. The amounts of the same and the form of the judgment will be settled by me upon a day to be fixed by counsel on which they may appear before the court.