**CENTRAL ARMATURE WORKS, INC., Plaintiff,**

v.

**AMERICAN MOTORISTS INSURANCE COMPANY, et al., Defendants.**

**Civ. A. No. 78–0695.**

United States District Court, District of Columbia.

May 12, 1980.

On Motion For Judgment Notwithstanding Verdict Aug. 13, 1981.

John P. Arness, John R. Gerstein, Hogan & Hartson, Washington, D. C., for plaintiff.

James Gregg, Washington, D. C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

This case involves a suit by Central Armature, an electrical equipment contractor, against its primary insurer, American Motorists Insurance Company (AMIC), and its "excess" carrier, Employers Reinsurance Company (ERC) for compensatory and punitive damages. The plaintiff alleges that both insurers breached their obligations by failing to defend plaintiff in a suit brought by one of its customers, Joseph Smith & Sons, and by failing to indemnify plaintiff for sums expended in settling Smith's counterclaims. AMIC has now moved for summary judgment as to all issues and Central Armature has opposed and moved for summary judgment on the issue of AMIC's liability. The parties agree that there are no disputed material facts and that it is appropriate for the Court to rule on the legal issues presented by their cross motions for summary judgment. After consideration of the parties' memoranda and the oral argu-

ment of counsel, the Court determines that Central Armature is entitled to judgment.

### Factual Background

In March 1975, plaintiff Central Armature filed in the Superior Court of the District of Columbia[1] a breach of contract action against Joseph Smith & Sons, Inc., claiming money due on account based upon certain electrical repair work on machinery used by Smith in its automated salvage business. The machinery in question, collectively known as a "shredder," was used to process scrap metal into small chunks. Central Armature claimed an unpaid balance of $48,000 for services rendered. The Smith company counterclaimed alleging, *inter alia*, negligent performance of the repair services by Central Armature resulting in substantial property damage, and in other instances, failure to perform the work contracted for. The damages sought on the counterclaim were between $1.3 to 1.8 million.

> The Smith counterclaim read in part: As a result of the wrongful acts of the Plaintiff and its failure to perform its contractual obligations, the Defendant paid to the Plaintiff sums of money which were not owed; Defendant was required to expend large sums to correct the work performed by the Plaintiff, it suffered great loss of profits; and it was required to expend large sums of money for the replacement of electrical equipment damaged by the work which was not performed or improperly performed by the Plaintiff.

During the course of the Superior Court litigation, settlement efforts were extended and ultimately Central Armature determined that it would be in its best interest to settle the litigation. Accordingly Central Armature settled its claim and the counterclaim by paying the sum of $110,000 to Smith company.

It is the Smith counterclaim and the Central Armature settlement which gives rise to the present litigation between plaintiff Central Armature Works, Inc. and defendant American Motorists.

At the time of the Superior Court litigation and at all relevant time prior thereto, Central Armature was covered by a special AMIC multi-peril insurance policy. That policy obligated AMIC to defend any suit against Central Armature seeking damages for bodily injury and/or property damage, and to pay up to a limit of $500,000, all sums which Central Armature became legally obligated to pay as damages because of bodily injury and/or property damage arising out of all operations necessary or incidental to Central Armature's business. AMIC was given proper notice of the Smith counterclaim. However, it declined coverage and informed Central Armature that it would not defend, claiming that there was "no occurrence" and "no property damage" as defined in the policy.

Because AMIC refused to defend on the counterclaim, Central Armature bore the entire expense of the litigation and defense for approximately one year. At the end of the year, however, AMIC changed its position and agreed to defend the counterclaim, reserving, however, the right to deny coverage at a later time.[2] From that point on until the termination of the Superior Court litigation, AMIC retained an attorney to represent Central Armature. As that attorney gained familiarity with the factual issues and as discovery developed, he advised the carrier that, in his opinion, they were obligated to Central Armature under the policy for a substantial portion of the

---

1. *Central Armature Works, Inc. v. Joseph Smith & Sons, Inc.*, D.C. Superior Court, Civil Action No. 2416–75.

2. In its July 15, 1976 letter informing Central Armature that it would provide a defense on the counterclaim, AMIC expressly reserved its right to disclaim coverage under exclusions (k)(3) and (m)(1) and (2). Three weeks later,

AMIC sent a second letter stating that the July letter was in error in that exclusion (k) should have read exclusion (e) and that exclusion (m) should have read exclusion (n). AMIC reiterated this position in another letter sent one year later. AMIC neither enlarged nor clarified its reservation of rights further.

Smith Company counterclaim.[3] He also expressed concern that he had a conflict in representing Central Armature while considering the coverage question. The defendant carrier nonetheless maintained its original position as to coverage. Central Armature's own attorney, who had filed the original complaint and responded and represented them initially on the Smith counterclaim, continued to represent Central Armature during the entire course of the Superior Court litigation together with the AMIC attorney. The latter, however, was concerned principally with defense of the counterclaim.

During the pre-trial stages it became clear to Central Armature that it faced a strong likelihood of a defendant's verdict on the Joseph Smith counterclaim, substantially larger than the unpaid balance of $48,000 claimed in the complaint. Estimates on a potential verdict ranged from $250,000 to $450,000. Central Armature's attorney strongly recommended that the case be settled, if it could be negotiated in the range of $150,000 to $175,000. Central Armature requested that AMIC agree to pay whatever settlement amount could be agreed upon in that range. AMIC refused and offered to pay Central Armature only $30,000. That offer was less than the amount of Central Armature's attorneys' fees for the period before AMIC took over defense of the case and it conditioned the payment of even that amount on Central Armature's agreeing to drop all of the claims that it had against AMIC.

Central Armature made clear to AMIC that in light of its attorney's representations that there was a 50 percent chance of a substantial verdict well beyond the recommended range of settlement and in light of the impact of a substantial verdict on its business, it had no choice but to settle. On the eve of the Superior Court trial AMIC was also advised by its attorney that Central Armature faced the probability of a sizeable judgment on the counterclaim and that a Smith settlement offer of $137,000 was "clearly a 'take' figure." Repeated requests to AMIC to contribute and recognize its obligation under the insurance policy were refused. The final settlement, as arranged by Central Armature's attorney, provided that Central Armature would drop its claim for $48,000 and would also pay Joseph Smith $110,000 out of its own funds.

Central Armature then brought this suit seeking compensatory and punitive damages against AMIC and Employers Reinsurance Company, Central Armature's excess carrier, asserting that the insurers breached their duty to defend and settle the claims against Central Armature. AMIC has moved for summary judgment on all issues, and Central Armature has cross-moved for summary judgment on the issues of AMIC's duty to defend and indemnify.

### Legal Analysis

On basis of the foregoing facts, the Court concludes that Central Armature is entitled to summary judgment on the issues of liability. AMIC's duty to defend and its duty to indemnify arise as a matter of law, for the following reasons.

■ The duty of an insurer to defend a lawsuit brought against its insured is established by the allegations in the complaint. *S. Freedman and Sons v. Hartford Fire Insurance Co.*, 396 A.2d 195, 197 (D.C.App. 1978); *Boyle v. National Casualty Co.*, 84 A.2d 614, 616 (D.C.Mun.App.1951). It is also well established that the duty to defend is broader than the duty to indemnify, *S. Freedman & Sons*, 396 A.2d at 197, and the parties to this suit agree that if some of the counterclaim against Central Armature fell within the terms of the policy, AMIC would have a duty to defend on all allegations. *Hazard v. Aetna Casualty & Surety*, 253 F.Supp. 845, 847 (D.D.C.1966).

Paragraph 11 of the Smith counterclaim, set out above, clearly alleges damage to certain "electrical equipment" as the result of Central Armature's acts. This allegation, at least, falls squarely within the coverage provisions of the policy, and triggers AMIC's duty to offer a defense to the coun-

---

**3.** Other AMIC employees also have conceded that there was some coverage under the policy.

terclaim. AMIC at first attempted to disclaim all coverage under the policy on the grounds that there was no "occurrence" and no "property damage" within the terms of the policy. These claims are not borne out by the plain language of the policy and have not been pressed by the insurer. AMIC subsequently asserted a series of exclusions contained in the policy, and reserved its rights to deny coverage under these exclusions even after it entered a defense on behalf of Central Armature. In its motion for summary judgment, however, it advances only a single exclusion, exclusion (m), which it had not raised until after this lawsuit began.

■ Exclusion (m), known in the industry as a "business risk" exclusion, is a standard feature in insurance policies issued to business enterprises. It provides that

> This insurance will not apply . . .
>
> (m) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.

By its terms, exclusion (m) excludes coverage to the insured's own work or products caused by the insured's faulty workmanship. *See e. g. Weedo v. Stone E. Brick, Inc.*, 81 N.J. 233, 405 A.2d 785 (1979). It does not, however, exclude damages to other property not manufactured or provided by the insured caused by the insured's poor performance. *Id.* at 792. Since there is no dispute that Central Armature did not supply or manufacture the electrical equipment mentioned in the Smith counterclaim, the allegation of damage to that equipment is not within exclusion (m). This allegation alone, created AMIC's duty to defend against the counterclaim.[4] AMIC's initial denial of coverage therefore breached the duty to defend and made it liable to Central Armature for the cost incurred in defending against the Smith counterclaim. Whether

this breach continued after AMIC undertook the defense in July 1976 cannot be determined on the basis of the undisputed facts before the Court.

Central Armature also demands damages to compensate for AMIC's failure to indemnify it for amounts paid to Smith to settle the original action. AMIC maintains that even if it owed Central Armature a duty to defend, Central Armature's "unauthorized settlement" of the suit released the insurer from any obligation to indemnify under the policy. To support its position, the insurer relies on the standard provisions in the policy which give the insurer control over any litigation and require its written consent to any settlement. By not obtaining this consent, AMIC argues that Central Armature has failed to abide by the contractual preconditions to any claim against the insurer. AMIC's own conduct during the Superior Court litigation, however, estops it from asserting the "unauthorized" settlement as grounds for refusing to indemnify.

■ An insurance carrier owes and has a duty to consider the insured's interests at least as much as its own when determining whether or not to settle. *See e. g., State Farm Mutual Automobile Insurance Co. v. Smoot*, 381 F.2d 331, 337–38 (5th Cir. 1967); *Coppage v. Fireman's Fund Insurance Co.*, 379 F.2d 621, 623 (6th Cir. 1967); *Potomac Insurance Co. v. Wilkins Co.*, 376 F.2d 425, 427–28 (10th Cir. 1967). When an insurer denies coverage, even if that denial is in good faith, a refusal to settle is viewed as an effort to further the insurer's interests. *See e. g., Gibbs v. State Farm Mutual Insurance Co.*, 544 F.2d 423, 427 (9th Cir. 1976). The proper course for an insurer in such circumstances is to stay proceedings against the insured and seek a resolution by way of declaratory judgment or to pay the settlement and seek indemnification from the insured. *See Great American Insurance Co. v. Raque*, 448 F.Supp. 1355, 1358 (E.D. Pa.1978), *aff'd*, 591 F.2d 1335 (3d Cir. 1979).

---

4. In addition, AMIC's failure to mention this exclusion when it reserved its rights under the policy estops AMIC from raising it in this litigation to avoid its duties under the policy. *See e.*

g. *Walker v. American Ice Co.*, 254 F.Supp. 736, 741 (D.D.C.1966); *Ebert v. Balter*, 83 N.J. Super. 545, 200 A.2d 532 (1964).

The undisputed facts demonstrate that AMIC's conduct did not meet these standards. First, AMIC never gave Central Armature a definitive statement on coverage so that Central Armature could gauge its own potential liability despite internal memos admitting coverage. AMIC continued to disclaim liability as to much, if not all, of the claim against Central Armature up and until the time of the settlement. For all Central Armature knew, it faced liability for nearly all of Smith's claim. AMIC's refusal to end this possibility by entering into what all agreed was an "excellent" settlement indicates a willingness to further its interests at the expense of its insured's. In effect, AMIC's actions denied Central Armature any assurance of protection against a large verdict while blocking Central Armature's efforts to reduce its liability through settlement. In such cases, when the carrier "has failed to exercise diligence, good faith, and conscientious fidelity in safeguarding the interests of the insured," contract provisions prohibiting settlement without the consent of the insurer will not be enforced. *Franklin v. Oklahoma City Abstract and Title Co.*, 584 F.2d 964, 968 (10th Cir. 1978); *Isadore Rosen & Sons, Inc. v. Security Mutual Insurance Co.*, 31 N.Y.2d 342, 343, 339 N.Y.S.2d 97, 291 N.E.2d 380, 382 (1972). Central Armature's settlement of the Smith case thus does not excuse AMIC from its obligation to indemnify under the policy.

There remains the question of the extent to which AMIC must indemnify Central Armature under the policy. As noted earlier, the specific exclusions cited by AMIC, including exclusion (m) cannot be invoked to deny coverage. AMIC, however, raises an additional argument for limiting its obligation to indemnify Central Armature for damages claimed. The Smith counterclaim alleged, among other injuries, "great loss of profits" resulting from Central Armature's acts. AMIC seizes on this term and argues that there is no coverage for loss of profits, since they cannot be considered "property damage" within the terms of the policy. Central Armature, however, characterizes this allegation as a claim for damages resulting from "loss of use" of some of Smith's property due to physical injury. The plaintiff points out that the policy obligates AMIC to pay "all sums which the insured becomes obligated to pay as damages because of . . . property damage to which this insurance applies . . . ." The policy expressly defines "damages" to include "damages for loss of use of property resulting from property damage." According to Central Armature, if there is injury to property, damages flowing from that injury will be within the policy's terms.

Cases interpreting insurance contracts with similar provisions support the broader construction urged by Central Armature. The policy does not limit coverage strictly to indemnifying for physical injury to tangible property. It also covers damages "naturally flowing from that injury." *Yakima Cement Products Co. v. Great American Insurance Co.*, 22 Wash.App. 536, 590 P.2d 371, 377 (1979). *See General Insurance Co. v. Gauger*, 13 Wash.App. 928, 538 P.2d 563 (1975); *Safeco Insurance Co. v. Munroe*, 165 Mont. 185, 527 P.2d 64 (1974). To the extent that the "lost profits" element of Smith's claim stems from loss of use of the shredder resulting from property damage inflicted by Central Armature's acts, it is within the coverage of the AMIC policy.[5]

In summary, the Court concludes: that AMIC breached its duty under the multi-peril policy to defend Central Armature when it declined coverage on the Smith counterclaim and that AMIC breached its obligations to indemnify Central Armature for the settlement of the Joseph Smith counterclaim; that AMIC is estopped from denying insurance coverage on the ground that the plaintiff entered into an unauthorized settlement; exclusion (m) in the AMIC policy is inapplicable and AMIC is, in any

---

5. In any event, it appears AMIC would be estopped from raising this argument as a grounds for refusing coverage since its final reservation of rights letters make no reference to this aspect of the policy's coverage. *See* footnote 2 and authorities cited in footnote 4 *supra*.

event, estopped from relying upon it; and, "loss of use" constitutes "property damage" and under the facts of this case, compensable "damages" under the AMIC policy.

## ON MOTION FOR JUDGMENT NOTWITHSTANDING VERDICT

This case is before the Court on the motion of defendant American Motorists Insurance Company (AMIC) pursuant to Federal Rules of Civil Procedure 50 and 59(e) for a judgment notwithstanding the verdict or for a new trial. Defendant is seeking to overturn a jury award of $2 million on a claim for punitive damages for AMIC's failure to honor its obligations under an insurance policy. In addition, the Court has before it a detailed accounting submitted by the plaintiff, Central Armature Works, in support of its claim for attorney fees which were awarded by a previous decision in this case. After reviewing the parties memoranda and the trial record, the Court has concluded that the verdict awarding punitive damages is neither contrary to law nor unsupported by the evidence in this case. The award itself, however, is excessive and will be reduced. Even after remittitur, the punitive judgment remains substantial. For this reason, a separate award of attorney fees is unwarranted.

### Background

Central Armature Works, an electric contracting firm purchased a multi-peril insurance policy from AMIC which covered, in certain situations, injury to the property of third parties on which plaintiff was performing work. In 1975 Central Armature was sued by Joseph Smith & Sons, a local firm, for damages to Smith's metal shredding equipment allegedly caused by Central's negligent performance of a service contract. Central notified AMIC of the claim and requested that AMIC provide a defense, as required by the policy. AMIC initially refused disclaiming coverage under its policy. Upon review, however, AMIC

1. A more detailed statement of the facts, as presented by plaintiff, appears at 293–296, *infra.*

admitted, internally, that there was coverage. Subsequently it agreed to provide a defense, but refused to inform Central that it had concluded there was coverage under the policy. AMIC never provided plaintiff with a correct statement of reasons disclaiming coverage. It did provide plaintiff with an attorney to defend the Smith claim, who also provided AMIC with opinions on coverage.

As the case progressed, it became apparent that Central Armature faced the prospect of a considerable verdict against it. Faced with this probability, plaintiff arranged a settlement of the Smith case, and invited AMIC to participate. AMIC, however, refused to contribute more than $30,000 to a proposed settlement of $110,000. Moreover, AMIC conditioned its participation on Central Armature surrendering all its rights under the contract. Plaintiff rejected these terms, settled the case using its own funds, and brought this suit against AMIC for compensatory and punitive damages.[1]

On May 12, 1980, the Court entered a Memorandum Opinion and Order granting the plaintiff's motion for summary judgment on the issues of coverage under the policy and AMIC's liability for compensatory damages. The issue of punitive damages was reserved for trial. On December 19, 1980 the Court entered a supplemental memorandum and order concerning the amount of compensatory damages due Central Armature. Attorney fees were awarded in principle at that time, but due to insufficient documentation, the precise amount was not calculated. Plaintiff's attorneys have since filed a more detailed statement to support their claim.

On February 23, 1981, this case came on for trial of the punitive damage issue. After a six day trial, the jury deliberated approximately one hour before returning a verdict of two million dollars for the plaintiff.

## Analysis

Defendant's motion for a judgment notwithstanding the verdict or in the alternative, for a new trial, raises two broad arguments. First, AMIC argues that the jury instructions did not accurately reflect the law governing the award of punitive damages in contract cases. Second, defendant asserts that, even if the Court's instructions are correct, the evidence was insufficient to support an award of punitive damages.

### I. Legal Standards Governing the Award of Punitive Damages

The punitive damages issue is familiar to the Court, having been briefed on a number of occasions during the course of this proceeding. AMIC raises three points in attacking the jury instructions given in this case: (1) that punitive damages cannot be recovered for a breach of contract regardless of the motive of the breaching party; (2) that the claim to punitive damages must be supported by clear and convincing evidence and not a mere preponderance; and (3) that plaintiff must prove that the defendant acted through actual malice—"an actually proven intent to harm" when it committed the wrongful act. After reviewing the most recent arguments advanced by AMIC, the Court remains satisfied that the instructions read to the jury correctly state the law.

This suit is a diversity action and the Court must therefore look to District of Columbia law for the controlling precedents. *Steorts v. American Airlines*, 647 F.2d 194, 196 (D.C.Cir.1981). The leading case on the availability of punitive damages in contract actions is *Brown v. Coates*, 253 F.2d 36 (D.C.Cir.1958). That case, decided under District of Columbia law, holds that exemplary damages may be awarded for a breach of contract, but only when' the breach is aggravated by particularly egregious conduct on the part of the defendant. In rejecting the argument that punitive damages could not be awarded in contract cases, the Court stated:

> Some courts have refused to allow the imposition of punitive damages in *any* contract actions, regardless of the types of contracts involved or the circumstances surrounding their breach.
>
> We join with those courts which decline to follow such mechanical classification. We believe the better view to be that in certain, narrowly defined circumstances, where a breach of contract merges with, and assumes the character of, a wilful tort, calculated rather than inadvertent, flagrant, and in disregard of obligations of trust punitive damages may be assessed.

253 F.2d at 39 (footnotes omitted) (emphasis in original). In *Brown*, a real estate broker, acting as an agent for the plaintiffs, purchased the plaintiffs' residence and sold them a new one. In the course of this "exchange" sale the plaintiffs lost the considerable equity they had held in the first residence because the written contract, drafted by the defendant, did not provide in any fashion for this amount to be credited toward the purchase of the new home. When the plaintiffs hesitated at one point, the broker assured them he would take care of them and volunteered that he was a lawyer. The Court concluded that this conduct warranted a punitive award even though the underlying claim was for breach of contract.

Cases subsequent to *Brown* have continued to examine the asserted breach to determine if aggravating circumstances are present. *See Keshishian v. Washington Square Associates*, 414 A.2d 834 (D.C.App. 1980) (proof of fraud and deceit will support punitive damage award since they necessarily encompass malice); *Den v. Den*, 222 A.2d 647, 648 (D.C.App.1966) (no fraud or misrepresentation present); *McIntosh v. Aetna Life Insurance Company*, 268 A.2d 518 (D.C.App.1970) (no evidence of bad faith in refusal to pay portion of proceeds due under life insurance policy).

A second factor to be considered is the relationship between the parties. In *Brown*, the Court emphasized the "fiduciary" relationship that it found between the real estate broker and his clients. In establishing this relationship and the accompany-

ing high standard of conduct, the Court relied not only on the agency relationship between the parties, but also on the public policy considerations which had lead to the regulation of the real estate broker industry. 253 F.2d at 39.

AMIC attempts to distinguish this case from *Brown* on this point. According to AMIC, no special relationship was created by the insurance contract; instead the dispute here involved arms-length dealings between two businesses both represented by competent counsel. From this observation, AMIC concludes that this is purely a breach of contract suit, like *Keshishian* or *Den*, in which punitive damages cannot be awarded in the absence of fraud, misrepresentation or "actual malice", a standard higher than that usually applied in tort suits asking punitive awards.[2]

Neither party has presented any authority from the District of Columbia which establishes the relationship between an insurer and its insured. Some indication that insurers have additional obligations appears in *Continental Insurance Company v. Lynham*, 293 A.2d 481, 483 (D.C.App.1972). There the Court noted that "the insurer has a duty to process and pay claims expeditiously and in good faith . . . ." Moreover, like the real estate broker in *Brown v. Coates*, the insurance carrier is an industry regulated in the public interest by a comprehensive statutory scheme. 35 D.C.Code §§ 101–2004. *See Brown v. Coates*, 253 F.2d at 39. Given these considerations, the court concludes that under the law of the District of Columbia, an insurer has additional obligations to its insured which subject it to more stringent standards of conduct than those normally imposed on parties to a contract. For this reason, the court believes that AMIC may be found liable for punitive damages even if it was not motivated by "actual malice" or even if its conduct did not amount to fraud or misrepresentation. Rather, as the Court

charged the jury at trial, AMIC may be liable for punitive damages if its actions were "oppressive or in willful and wanton disregard of Central Armature's rights."

This conclusion is neither remarkable nor unprecedented in the insurance law field, as AMIC suggests. Although not directly anticipated by decisions in the District of Columbia, these standards have been adopted in a number of other jurisdictions. For example, in *Vernon Fire and Casualty Insurance Co. v. Sharp*, 349 N.E.2d 173 (Ind. 1976), a case cited by AMIC, the Indiana Supreme Court sustained an award of punitive damages against insurers who had refused to pay the proceeds of a casualty policy to a factory owner, whose plant had been damaged by fire, until the owner provided the insurers with a release from any claims by one of the owner's employees. The *Vernon* court recognized that "an independent tort is not a prerequisite to the recovery of punitive damages" in a contract action. 349 N.E.2d at 180–81. Plaintiff's allegation that the insurers had "acted in an intentional and wanton manner in dealing with their insured . . . and have refused to pay this plaintiff the proceeds" due under the policy, was deemed sufficient to support the award. *Id.* at 179, 184. To support this claim, plaintiff presented evidence to show that "the insurers dealt with his claim with an 'interested motive' and wrongfully attempted by virtue of their superior position to exact additional consideration from the plaintiff before performing their obligations under the contract. This evidence was sufficient to establish a serious intentional wrong." *Id.*

Indiana is not alone in following this doctrine. Numerous other jurisdictions allow a plaintiff to recover punitive damages when an insurer acts willfully, oppressively, or in bad faith in refusing to honor its obligations under an insurance contract. *See, e. g., Black v. Fidelity & Guaranty Insurance*

---

2. In tort suits "actual malices" is not required; instead "defendant must act with such conscious and deliberate disregard of the consequences of his actions to others that his conduct is wanton." *Knippen v. Ford Motor Com-*

*pany*, 546 F.2d 993, 1002 (D.C.Cir.1976). Gross negligence is insufficient. *Nader v. Allegheny Airlines*, 512 F.2d 527, 549–50 (D.C.Cir.1975), *rev'd on other grounds* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976).

*Underwriters,* 582 F.2d 984, 990 (5th Cir. 1978) (applying Mississippi law); *State Farm Mutual Automobile Insurance Co. v. Smoot,* 381 F.2d 331 (5th Cir. 1967), *cert. denied,* 390 U.S. 1005, 88 S.Ct. 1248, 20 L.Ed.2d 105 (1968) (applying Georgia law); *Robertson v. State Farm Mutual Automobile Insurance Co.,* 464 F.Supp. 876 (D.S.C. 1979) (applying South Carolina law); *Phillips v. Aetna Life Insurance Co.,* 473 F.Supp. 984 (1979) (applying Vermont law).[3]

The jury instructions given in this case, which were modelled on the standard civil instructions in this jurisdiction, reflect these principles.[4] The jury was instructed in pertinent part that:

> To award punitive damages you must find that American Motorists acted with conscious and deliberate disregard of the consequences of its actions to the plaintiff and that its conduct was wanton and reckless.
>
> You are instructed that gross negligence will not support a finding of punitive damages. The defendant's conduct must be more and beyond that of gross negligence.
>
> In deciding whether Central Armature is entitled to punitive damages, you should consider all of the circumstances.
>
> \*    \*    \*    \*    \*    \*
>
> You should also consider and evaluate the defendant's actions in light of the information it had available when it took those actions and determine whether defendant exercised an honest, even if a wrong, judgment under the totality of the circumstances.
>
> If after hearing the evidence and weighing it, you are convinced by a preponderance of the evidence that the defendant acted with a conscious and deliberate disregard of its actions toward the plaintiff, then you may in your discretion assess punitive damages against American Motorists.
>
> \*    \*    \*    \*    \*    \*

The defendant should properly consider factors such as the estimated value of the claims asserted against the plaintiff based upon past experience and the information provided to it by counsel, the impact of a settlement from the insurance company, the impact of a verdict against this plaintiff, the bases for the claim asserted against plaintiff in the Smith case, the alleged damages, and whether the risks [of] an unfavorable outcome were out of proportion to the chances of a favorable outcome.[5]

These instructions accurately reflect the law. They gave AMIC a complete opportunity to show that its conduct, even if erroneous, was reasonable. The jury plainly found it was not.

■ Defendant's second and third arguments concerning the instructions can be dealt with quickly. The contention that entitlement to punitive damages must be proven by "clear and convincing" evidence finds no support in the numerous cases on punitive damages cited by both parties. The jury was properly instructed that it must find that the plaintiff has supported its claim by a preponderance of the evidence, the usual burden in civil cases. Finally, defendant's contention that "actual malice"—an actually proven intent to harm—is directly contrary to the authority in this district. *See Knippen v. Ford Motor Company,* 546 F.2d 993, 1002 (D.C.Cir.1976). A defendant need act only "with such conscious and deliberate disregard of the consequences of his actions to others that his conduct is wanton." *Id.*

## II.   *The Sufficiency of the Evidence*

AMIC also contends that the plaintiff's evidence will not support a punitive award. The standard for overturning a jury verdict, however, is not easily met. A "motion

---

**3.** In some cases, the cause of action may be described as a tort. *E. g., Robertson v. State Farm,* 484 F.Supp. at 85–86. The underlying facts, however, are essentially the same in a contract or tort suit.

**4.** Standardized Civil Jury Instructions for the District of Columbia (Revised Edition 1980).

**5.** Transcript (Tr.) of March 4, 1981, 20–25.

for judgment n. o. v. may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." 5A *Moore's Federal Practice*, ¶ 50.07[2] (2d ed.). Moreover, "[i]n considering the motion, the court must view the evidence in the light most favorable to the party who secured the jury verdict." *Id.* Under these standards the defendant's motion for judgment notwithstanding the verdict must be denied.

Considered in a light most favorable to plaintiff, the evidence would show the following course of events. When Central Armature received the Smith counterclaim, it requested that AMIC provide it a defense. AMIC declined, stating, incorrectly, that the counterclaim did not involve an "occurrence" or "property damage." Central Armature therefore began defending the Joseph Smith counterclaim at its own expense. In June of 1976, Central Armature renewed its demand upon AMIC to provide a defense and coverage. Internally, AMIC recognized that it did owe a duty to defend Central Armature and that it should have undertaken the defense at the outset. AMIC also recognized that it owed attorney fees to Central Armature for the year it had failed to provide a defense. The insurer was informed that Central Armature had paid approximately $35,000 in attorney fees and that Central Armature thought AMIC should reimburse them. However, at no time did AMIC inform Central Armature that it recognized it owed attorney fees and AMIC made no offer to pay them. After AMIC retained an attorney to provide a defense, that attorney, with AMIC's knowledge, continued to request the assistance of Central Armature's own attorney in the defense of the case. AMIC recognized that it owed fees for some of this work also.[6] Prior to the conclusion of the Joseph Smith case, AMIC was informed that Central Armature had incurred, and was claiming approximately $60,000 in legal fees. But AMIC continued to conceal from Central Armature its recognition that it owed Central Armature attorney fees.

In July of 1977, Central Armature sought an opinion from outside counsel concerning coverage under the policy. The opinion concluded that AMIC's policy provided full coverage for all of the claims then being pressed by Joseph Smith. Central Armature transmitted the opinion to AMIC in the hope that it would convince AMIC to change its position concerning coverage. Central Armature did not know at that time that internally AMIC recognized that it owed coverage to Central Armature.

AMIC also obtained an opinion from outside counsel which concluded that AMIC did not have a duty to defend Central Armature, and that there was no coverage. However, the opinion was erroneous, a fact which AMIC's claims personnel recognized immediately.[7] AMIC nonetheless informed Central Armature that it had an opinion from counsel that there was no coverage.[8] AMIC never told Central Armature that it did not believe the opinion was correct.[9] AMIC also refused to share the opinion with plaintiff for it knew that even a cursory review of the opinion by Central Armature would reveal the major flaws and expose the fact that AMIC did not have a legitimate basis to continue to deny coverage responsibility. In addition AMIC instructed the attorney who had been hired by AMIC to represent Central Armature, and who had been given a copy of the opinion, *not* to give it to Central Armature. Indeed, AMIC never gave Central Armature any meaningful information concerning AMIC's position on coverage. Instead, it sent out a "final" reservation of rights letter incorporating by reference the exclusions recited in its previous reservation-of-rights letters, which AMIC knew referred to non-existent or totally irrelevant exclusions.

---

6. Morrison dep., August 28, 1979 at 56–57—read into evidence February 26, 1981.

7. Morrison dep., August 28, 1979 at 51–52—read into evidence February 26, 1981; PX 91.

8. Tr. February 25, 1981 at 136, 139 (Cobert).

9. *Id.*; Tr. February 24, 1981 at 21 (Dorr).

By the pretrial of the Smith case in July, 1977, the attorney hired by AMIC to represent Central Armature projected that Smith had a 50–50 chance of prevailing on liability and that the most likely verdict range would be $300,000 to $450,000. Central Armature feared that it probably would be bankrupted by such a verdict, and shared this concern with AMIC. Joseph Smith's pretrial statement and supplemental answers to interrogatories, filed at approximately the same time, provided a breakdown on the amount being claimed for each damaged machine. AMIC learned that in the areas where a judgment would probably come, at least 80% of the damages were covered by AMIC's policy.

On November 29, 1977, Central Armature and AMIC representatives met to discuss the Smith suit. Central Armature proposed a number of alternatives by which the parties could work out a settlement of the Smith case. Under these alternatives, AMIC would have contributed to the settlement, Central Armature would have bonded off the amount of this contribution, and the coverage issue would have been litigated. AMIC rejected these proposals, but agreed that the case should be settled. AMIC proposed that it would contribute $30,000 to a settlement of the Smith case, but only if Central Armature would agree to give up all of its rights against AMIC, including attorney fees, monies owed by AMIC for coverage, and any bad faith claims Central Armature may have had against AMIC. Central Armature rejected this offer. Thereafter, AMIC made no further attempt to participate financially in the Smith settlement, and Central Armature settled the Smith case using its own resources and a bank loan.

AMIC had another opportunity to assist Central Armature. On December 21, 1977, Central Armature wrote AMIC outlining the alternative solutions which Central Armature had previously proposed. The letter concluded by stating that an agreement had just been reached to settle the Smith case by payment to Smith of $110,000 and a dismissal of Central Armature's claim on account for $48,000, and requested AMIC to assist financially. Four months passed without any response from AMIC concerning the December 21, 1977 letter requesting that it help in the settlement before Central Armature finally filed the instant lawsuit.

AMIC's recalcitrance on the coverage issue continued even after this suit was filed. In response to interrogatories filed at the outset of this case, AMIC responded under oath by categorically denying that it ever had a duty to defend Central Armature and by categorically denying that AMIC had any coverage for any of the claims in the Smith case.[10] As full discovery showed, and as the testimony at trial confirmed, AMIC's answers were untrue.

These facts would establish that AMIC had dealt with its insured in bad faith by refusing to reveal its true position on coverage; that it had acted in willful disregard of plaintiff's own rights under the policy in an effort to advance its own interests; and that it had acted oppressively in attempting to coerce the plaintiff into surrendering some of its rights under the policy as a condition of participation in the settlement. When considered as a whole, these factors warrant a punitive award in this case.

AMIC raises one final argument to shield itself from liability for punitive damages. Conceding, arguendo, that AMIC's claims personnel acted in a willful and oppressive manner in dealing with the plaintiff, AMIC nonetheless contends that these acts cannot be attributed to the corporation because they were not ordered or ratified by defendant's corporate officers or by its managing officials. The evidence established, however, that AMIC handled plaintiff's claims through regular channels, and that the claims personnel all were acting within their delegated authority. Moreover, the home office received copies of all memos and correspondence and a claims

---

**10.** AMIC's Answers and Interrogatories, filed July 24, 1979, Nos. 22 and 50—read into evidence Tr. March 2, 1981 at 19–20, 23–24.

manager within that office supervised the overall handling of the claim. This evidence is sufficient to establish ratification and support an award of punitive damages against the corporation. As Judge Fahy wrote:

> It is not essential that an executive officer of high corporate rank actively participate in the corporate conduct .... A corporation such as defendant, with offices in a number of cities and engaged in widespread activities, necessarily delegates authority to its agents to be used on its behalf. If these agents in the exercise of their delegated authority, acting through regular corporate channels, engage in conduct which, except for the corporate nature of their principal, makes out a case for punitive damages, the corporation is not shielded therefrom simply by the absence of explicit authorization or ratification of the particular conduct.

*General Motors Acceptance Corporation v. Froelich*, 273 F.2d 92, 94 (D.C.Cir.1959). This reasoning fully applies to the case before this Court.

### III. Amount of Punitive Damages

█ While plaintiff has demonstrated its entitlement to punitive damages, the amount assessed exceeds the bounds of a just award under the circumstances of this case. Our Circuit Court has recognized that:

> [T]he court may set aside an award of punitive damages deemed to be excessive or against the weight of the evidence, or larger in amount than the trial court thinks it justly ought to be. The trial court has a greater role than the court on appeal, but we may note that its function may encompass a duty, and not merely an opportunity to avoid excessive damages by remittitur or new trial.

*Afro-American Publishing Company v. Jaffe*, 366 F.2d 649, 662 (D.C.Cir.1966) (en banc) (footnotes omitted). Factors to be considered in determining the amount of punitive damages include reimbursing the plaintiff for litigation costs, including attorney fees, denying the defendant any profit from its wrongful behavior, and punishing and deterring undesirable conduct. *Id.* at 662–63. Despite these guidelines, punitive damages are difficult to quantify. Plaintiff argues that an award should take into consideration defendant's revenues or net worth. This approach however, only sets limits applicable to all awards of punitive damages; it offers little assistance in determining within those limits an appropriate award based on the gravity of the particular wrong now before the Court. Essentially, the standard remains whether "such an award [is] excessive, or larger than should be condoned in simple justice" given the three factors mentioned above. *Afro-American Publishing Company v. Jaffe*, 366 F.2d at 663.

█ A two million dollar award, while within the guidelines proposed by plaintiff, is disproportionate to the offense committed here. While defendant deserves punishment for its conduct in this case, and should be deterred from such conduct in the future, its behavior was neither so outrageous or reprehensible to merit an award of this size. Even when viewed in its most favorable light, plaintiff's evidence did not show an actual intent to injure Central Armature, as opposed to a calculated indifference to plaintiff's legal rights under the contract. AMIC's principal motive was plainly to advance its own interests rather than to bankrupt its insured. Although the jury was attentive and conscientious, its award of two million dollars is "larger than should be condoned in simple justice" under the facts of this case. Accordingly the court will reduce the award to one million dollars.

### IV. Attorney Fees

In its Order of December 19, 1980, the Court awarded plaintiff attorney fees incurred in establishing AMIC's liability for coverage under the policy. While not usually an element of compensatory damages in contract actions, attorney fees were found to be allowable as "within the sphere of damages awardable for breach of contract" when aggravating circumstances are present. *Siegel v. William E. Bookhultz & Sons, Inc.*, 419 F.2d 720 (D.C.Cir.1969). Relying on *Siegel*, the Court found that attorney fees could be awarded on the basis of the undisputed facts presented in the May

12, 1980 Memorandum Opinion granting summary judgment to the plaintiffs. The plaintiff was directed to supply a detailed justification of its claim for $130,000.

Since that time, the plaintiff has also been awarded punitive damages. Since under *Afro-American Publishing Company v. Jaffe*, punitive damages are awarded in part to reimburse a plaintiff for litigation expenses, a separate award of attorney fees would constitute a double recovery. Moreover, despite the additional documentation provided by the plaintiff to support its $130,000 claim, the Court is still unable to make a determination of the reasonableness of amount requested. In particular, plaintiff's principal attorneys do not indicate who performed particular tasks or the amount of time devoted to completing them.

For these reasons, the court will not make a separate award of attorney fees as an element of compensatory damages. The punitive award in this case, even as reduced by the court, more than adequately compensates the plaintiff for its litigation costs.

An appropriate Order and Judgment accompanies this Memorandum Opinion.