**GIBBS M. SMITH, INC., a Utah corporation, Plaintiff and Appellee,**

**v.**

**UNITED STATES FIDELITY & GUARANTY CO., a Maryland corporation, and Fidelity & Guaranty Underwriters, Inc., an Ohio corporation, doing business in Utah collectively as USF&G, Defendants and Appellants.**

**Nos. 960007, 960045.**

Supreme Court of Utah.

Dec. 2, 1997.

---

**2.** Utah Code Ann. § 10–2–401(3).

**3.** *Sandy City v. Salt Lake County*, 827 P.2d 212, 222 (Utah 1992).

Daniel G. Darger, Salt Lake City, for plaintiff and appellee.

Gary L. Johnson, Salt Lake City, for defendants and appellants.

HOWE, Justice:

An insurer appeals from the trial court's grant of partial summary judgment that its commercial general liability insurance contract with a publisher covers the loss in Malaysia of photographic transparencies belonging to the author whose book the publisher contracted to publish for sale in the United States. The insurer also challenges the trial court's grant of attorney fees to the publisher and the court's ruling that partial payment by the common carrier responsible for the loss cannot be deducted from the insurer's liability. The trial court certified the partial summary judgment as final under rule 54(b).

## FACTS

Publisher Gibbs M. Smith, Inc. (Gibbs), was the named insured under a commercial general liability insurance contract issued by insurer United States Fidelity and Guaranty Co. and Fidelity and Guaranty Underwriters, Inc. (collectively, USF & G). Gibbs entered into a publication contract with Tom Heinz, the author of a book on the midwestern

houses of Frank Lloyd Wright. Heinz planned to illustrate the book with reproductions of original photographs of the houses. The licensing agreement provided: "The Publisher will endeavor to take good care of all material delivered and will be responsible for any loss or damage caused to original photographs. Publisher and Heinz agree that each photograph is valued at fifteen hundred dollars. ($1,500.00)." Gibbs subcontracted the actual printing to Regent Printing in Hong Kong. Regent out-sourced the color separation of the photographs to a color separation house in Malaysia, which completed the separation and shipped two packages back to Hong Kong via Federal Express. One package contained the transparencies and the first set of marked proofs. The other contained additional materials for printing the books. Although both packages were manifest on loading in Malaysia, when the plane was unloaded in Hong Kong the box with the photographic transparencies was missing and has never been found. Regent Printing paid Gibbs $3000 toward the cost of the lost transparencies.

The loss occurred on July 26, 1993. In August 1993, Gibbs gave notice of the loss to USF & G's agent, Barlow Insurance Agency, which responded that coverage did not apply, apparently without ever forwarding the claim to USF & G. In January of 1994, Heinz contacted Gibbs by letter demanding payment of $1500 for each of the nineteen lost photographic transparencies as per the contract for a total of $27,000. Gibbs, through counsel, subsequently requested coverage directly from USF & G, which it refused, whereupon Gibbs brought this action against it. USF & G moved for summary judgment, arguing that the insurance contract did not cover the loss, and Gibbs filed a cross-motion for a declaration that coverage applies. The trial court ruled in favor of Gibbs, concluding that the agreement between Gibbs and Heinz was an "insured contract," that the loss occurred within the policy's "coverage territory," and that USF & G had breached its contract with Gibbs. The court additionally concluded that Gibbs' attorney fees for its suit against USF & G were a foreseeable consequence of the breach, warranting an award of fees and costs, and that under the

"collateral source rule," the $3000 payment from Regent could not be deducted from USF & G's liability to Gibbs.

## ANALYSIS

■ Summary judgment is appropriate only where there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c). "Questions of contract interpretation not requiring resort to extrinsic evidence are matters of law, and on such questions we accord the trial court's interpretation no presumption of correctness." *Zions First Nat'l Bank v. National Am. Title Ins.*, 749 P.2d 651, 653 (Utah 1988) (citations omitted).

The question before us involves the interpretation of a commercial general liability insurance contract. Coverage "A," "Bodily Injury and Property Damage Liability," provides:

1. Insuring Agreement.

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result . . . .

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period.

. . . .

2. Exclusions.

This insurance does not apply to:

a . . . .;

b. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

(2) That the insured would have in the absence of the contract or agreement.

The alphabetical list of exclusions stretches from "a" to "m," but the controversy before us centers on the interpretation of two of the exclusions, "b" and "l," and the definition of "coverage territory." We will detail these further as the discussion requires.

## I. CONTRACT EXCLUSION CLAUSE— EXCLUSION b.

Exclusion b. set out above provides that the insurance does not apply to contractually assumed liability for bodily injury or property damage except if the insured's agreement with the third party complies with the insurance policy's definition of "insured contract" (b.(1)) or the liability would have existed in the absence of the contract (b.(2)). USF & G contends that because Gibbs' liability to Heinz for the loss of the photographic transparencies is "assumed" in the contract between them and the contract does not meet the policy's definition of an "insured contract," exclusion b. operates to exclude coverage. Gibbs counters that his contract with Heinz qualifies as an "insured contract" and is therefore an exception to the exclusion. The trial court agreed with Gibbs.

As USF&G's brief correctly states, however, "Courts have over and over again interpreted the phrase 'liability assumed by the insured under any contract' to apply only to indemnification and hold-harmless agreements, whereby the insured agrees to 'assume' the tort liability of another." In the subsequent sentence, USF & G asserts that this language "does not refer, nor does it *provide coverage for*, the insured's breaches of its own contracts." (Emphasis added.) However, that language is an *exclusion*, not a grant of coverage. Thus, if USF & G is correct that the provision does not apply to the insured's breaches of its own contracts, such breaches are *not excluded* and coverage applies.

■ In *Olympic, Inc. v. Providence Washington Insurance Co.*, 648 P.2d 1008, 1011 (Alaska 1982),[1] the court observed, " 'Liability assumed by the insured under any contract' refers to liability incurred when one promises to indemnify or hold harmless another, and does not refer to liability that results from breach of contract." The court explained further:

> Liability ordinarily occurs only after breach of contract. However, in the case of indemnification or hold harmless agreements, assumption of another's liability constitutes performance of the contract. Because "liability assumed by contract" refers to a particular type of contract—a hold harmless or indemnification agreement—and not to the liability that results from breach of contract, the contractual liability exclusion applies only to hold harmless agreements.

*Id.* (citing 1 Rowland H. Long, *Law of Liability Insurance* § 1.12 (1981)); *see also* 43 Am.Jur.2d *Insurance* § 712 (1982). The pertinent law abundantly confirms that a liability insurance contract exclusion clause excludes only contracts in which the insured assumes the tort liability of another. *See Commercial Union Ins. v. Basic Am. Med.*, 703 F.Supp. 629, 633 (E.D.Mich.1989) (" '[C]ontractual exclusion clauses' deny the coverage generally assumed by a liability policy in cases in which the insured in a contract with a third party agrees to save harmless or indemnify [a] third party."); *Smithway Motor Xpress v. Liberty Mut. Ins.*, 484 N.W.2d 192, 196 (Iowa 1992) ("We believe there is a distinction between incurring liability through breach of an employment contract and incurring liability through entering a contract to assume liability of another."); *Aetna Casualty & Sur. Co. v. Cotter*, 26 Mass.App.Ct. 56, 522 N.E.2d 1013, 1014 (1988) ("The 'liability assumed' exclusion clause has been taken to refer to 'liabili-

---

**1.** (Citing *Dreis Krump Mfg. Co. v. Phoenix Ins. Co.*, 548 F.2d 681, 684 (7th Cir.1977); *J.L. Simmons Co. v. Fidelity & Cas. Co.*, 511 F.2d 87, 96 (7th Cir.1975); *Continental Ins. Co. v. Bussell*, 498 P.2d 706, 710 (Alaska 1972); *Haugan v. Home Indem. Co.*, 86 S.D. 406, 197 N.W.2d 18, 23 (1972).)

ty incurred' when one promises to indemnify or hold harmless another.").

The law imposes upon the insured a liability to pay damages for bodily injuries or damage to property caused by his carelessness and arising out of his ownership, maintenance, care, custody or use of property. This is the liability upon which the insurer agrees to pay all sums "which the insured shall become legally obligated to pay." ... "Liability imposed by law for damages," or damages which the insured becomes "legally obligated to pay," excludes liability which the insured may have voluntarily assumed.... An oral or written agreement by the insured to indemnify third persons or save them harmless is excluded from coverage generally assumed by the insurer under a liability insurance policy.... *Union Paving Co. v. Thomas*, 186 F.2d 172 (3d Cir.1951).

1 Rowland H. Long, *Law of Liability Insurance* §§ 1.07[1], 1.07[2] (1997). Long suggests that the rationale behind this rule is that "liability assumed by the insured under a contract or agreement presents an uncertain risk" which cannot be determined in advance for the purpose of fixing premiums. *Id.* § 1.07[2], at 1–42.1. Consequently, "[c]ontractual exclusion clauses which deny coverage for liability assumed by the insured under any contract or agreement not defined in the policy relieve the insurer from liability only in fact situations where the insured *would not be liable* to a third person except for the *express assumption of such liability.*" *Id.* at 1–44 (emphasis added). This is reasonable in view of the fact that "[a]ll business transactions are entered into according to some sort of agreement or understanding." *Larsen v. General Casualty Co.*, 99 F.Supp. 300, 302 (D.Minn.1951), *aff'd*, 196 F.2d 170 (8th Cir.1952).[2] If the contract exclusion

**2.** Finding that a contract to clean an oil burner "was the usual type which the policy was designed to cover within the terms of the policy if liability was imposed by law."

**3.** Although the trial court's grant of summary judgment relied on the conclusion that the license agreement was an "insured contract," "we may affirm a trial court's decision on any proper ground(s), despite the trial court's having assigned another reason for its ruling." *Buehner*

clause excluded all liability associated with a contract made by the insured, commercial liability insurance would be severely limited in its coverage. Therefore, the contract exclusion clause b. does not apply to Gibbs' liability to Heinz, and we need not consider the "insured contract" exception.[3]

## II. THE PRODUCTS–COMPLETED OPERATIONS HAZARD EXCLUSION—EXCLUSION *l.*

■ The parties devote a considerable portion of their briefs to "products-completed operations coverage." However, the "products completed operations hazard" is not a provision for coverage, but an *exclusion,*[4] as follows:

Exclusions.

This insurance does *not* apply to:

a. ...;

b. [contract exclusion clause]

...;

*l.* Property damage to "your work" arising out of it or any part of it *and included in the "products completed operations hazard."* This *exclusion* does not apply if the damaged work or work out of which the damage arises was performed on your behalf by a subcontractor.

(Emphasis added.) Thus, the threshold question becomes whether the work resulting in the loss was performed by a subcontractor, because the insurance contract provides that the exclusion does not apply to such work. USF&G does not challenge Gibbs' characterization of Regent Printing and the Malaysian color separation house as "subagents" or subcontractors. On the contrary, as discussed below, USF & G complains that Gibbs is guilty of misrepresentation because its insurance application form failed to ac-

*Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988) (footnote omitted).

**4.** "One type of clause in contractor's insurance is known as the 'completed operations hazards' which excludes from coverage of a liability policy [liability] for injury or damages occurring after the project is completed." 43 Am.Jur.2d § 719, at 785. For a more complete discussion, see 58 A.L.R.3d 12–142 (1974).

knowledge the publisher's use of subcontractors. The insurer thus admits, at least by implication, that Regent Printing and the color separation house functioned in that capacity. Therefore, exclusion *l.* does not apply to deny coverage.

## III. COVERAGE TERRITORY

Insurance coverage is limited to property damage that occurs in the "coverage territory," which the policy defines as the United States, its territories and possessions, Puerto Rico, and Canada. However, coverage also extends to

c. All parts of the world if:

(1) The injury or damage arises out of:

(a) Goods or products made or sold by you [named insured] in the territory described above; or

(b) ...; and

(2) The insured's responsibility to pay damages is determined in a "suit" on the merits in the territory described in (a) above, or in a settlement we [USF&G] agree to.

We will first address provision (1).

The trial court concluded that "the Frank Lloyd Wright books, which included the photographs supplied by Heinz, are goods manufactured and sold in the 'coverage territory,' as defined by Defendant's policy, thus extending the 'coverage territory' worldwide, and this loss incurred in the coverage territory." USF & G contends that the books had neither been completely made nor sold at the time of the loss. The layout and paste-up of the books occurred in Layton, Utah, although Gibbs subcontracted other aspects of the manufacture of the books to various locations. Furthermore, the *Midwestern Houses* book was volume four of a six-volume set treating the works of Frank Lloyd Wright. The preceding three volumes, which had already been published and sold in the United States, also contained photographic illustrations, possibly even reproductions of some of the photographs that were subsequently lost. The contract between Heinz and Gibbs referenced all six volumes. Therefore, if we consider the whole series as the "product," it had already begun to be sold in the United

States. Even if we consider only the volume currently in process, however, the terms "made" and "sold" appear in the contract unmodified as to tense. There is no indication that the contract contemplates only completed products. In fact, other provisions of the contract indicate that coverage applies specifically to uncompleted products. Under the policy definition of "products-completed operations hazard," there is no coverage for

a. ... "bodily injury" and "property damage" occurring away from the premises you own or rent and arising out of "your work" *except* [meaning there *is* coverage for]

(1) Products that are still in your physical possession or

(2) Work that has *not yet been completed* or abandoned.

(Emphasis added.) Therefore, "made or sold" cannot be restricted to past actions but must more logically refer to current and future actions.

 USF&G further argues that coverage does not apply because the loss involved only the photographs, which were not "goods or products" but merely part of an intermediate step in the manufacturing process. However, the policy provides coverage for damages which "arise out of" the goods or products. We noted in *National Farmers Union Property & Casualty Co. v. Western Casualty & Surety Co.,* 577 P.2d 961, 963 (Utah 1978):

As used in a liability insurance policy, the words "arising out of" are very broad, general and comprehensive. They are commonly understood to mean originating from, growing out of, or flowing from, and require only that there be some causal relationship between the injury and the risk for which coverage is provided.

*See also Rouse v. Greyhound Rent-A-Car, Inc.,* 506 F.2d 410, 414 n. 3 (5th Cir.1975) ("The term 'arising out of' is ordinarily understood to mean originating from, incident to, or connected with the item in question."). In the instant case, a causal connection exists between the loss of the photographs and the manufacture of the books. Consequently, the loss arose out of the "goods made or sold" by Gibbs in the coverage territory.

We next consider provision (2). According to the record before us, Gibbs' liability to Heinz has not been decided in a suit on the merits. Heinz demands payment of $27,000 from Gibbs according to their contract, but USF & G maintains that it has not approved that "settlement." However, USF & G's rejection of Gibbs' claim precluded further cooperation between them.

In a letter dated January 1994, Heinz asked Gibbs to perform on the contract and cover the loss. It would be irrational to require that Gibbs, after receiving notice denying coverage, compound its damages by forcing Heinz to sue it on the licensing contract. This irrationality is the reason that "provisions prohibiting out-of-court settlements between an insured and a claimant without the consent of the insurer are not enforced when the insurer repudiates coverage or denies liability." *Franklin v. Oklahoma City Abstract & Title Co.*, 584 F.2d 964, 968 (10th Cir.1978) (citations omitted); *see also Central Armature Works v. American Motorists Ins.*, 520 F.Supp. 283, 289 (D.D.C.1980). Furthermore, "[i]t is well settled that, at least after a denial of liability by an insurer, the insured may enter into a settlement with a third party without prejudicing its rights against the insurer." *Bunge Corp. v. London & Overseas Ins. Co.*, 394 F.2d 496, 497 (2d Cir.1968). Therefore, "an assured is entitled to exercise the judgment of a prudent uninsured person in compromising the claim when the insurer repudiates coverage." *Simon v. Maryland Cas. Co.*, 353 F.2d 608, 612 (5th Cir.1965). Indeed, when an insurer disclaims liability on the basis of noncoverage, not only may the insured bring an action against the insurer, but in addition "the insurer is bound by any reasonable compromise or settlement made by the insured." *Waugh v. American Cas. Co.*, 190 Kan. 725, 378 P.2d 170, 177 (1963).

Thus insurance contract provision c.(2), requiring suit on the merits or approval of the settlement, properly functions not to bar coverage but to protect the insurance company against the danger of collusive settlements between the insured and a third party. When an insurer declines to avail itself of this protection, the insured may act to protect its own interests without forfeiting the right to coverage. Consequently, a settlement agreement between Heinz and Gibbs would not defeat the publisher's rights against its insurer. We therefore hold that the loss occurred in the "coverage territory."

## IV. AWARD OF ATTORNEY FEES

USF&G assails the award of attorney fees made by the trial court to Gibbs on the grounds (1) that this is a third-party action in which fees are not recoverable, and (2) the award was premature because the trial court had not yet determined whether USF & G had acted in bad faith. USF & G correctly distinguishes between first-party coverage, which reimburses the insured for its own direct injuries, and third-party liability coverage, in which the insurer indemnifies the insured for its liability to third parties. *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798 n. 2 (Utah 1985). While the instant case involves a claim for third-party coverage, USF & G is being sued by its own insured. Therefore, the trial court did not err in concluding that this is a first-party action, although a more accurate statement might be that this is a first-party action for third-party coverage.

In *Beck* and later in *Billings v. Union Bankers Insurance Co.*, 918 P.2d 461 (Utah 1996), we held that in first-party actions, attorney fees are recoverable where there has been a breach of the implied covenant of good faith and fair dealing which inheres in every insurance contract. Bad faith need not be shown in proving a breach of the covenant. *Billings*, 918 P.2d at 465 n. 2. Instead, in *Beck* we explained:

> The implied covenant of good faith performance contemplates, at the very least, that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim.

*Beck*, 701 P.2d at 801. In the instant case, Gibbs pleaded a breach of the implied covenant of good faith and fair dealing in the second cause of action in its complaint. However, in the partial summary judgment granted to Gibbs, which is before us in this

appeal, no determination was made whether the covenant was breached. Thus the award of attorney fees made by the trial court cannot stand. On remand, the trial court should determine whether the covenant has been breached and award or deny attorney fees accordingly.

## V. ROLE OF THE PAYMENT FROM REGENT PRINTING

Gibbs contends that under the collateral source rule, USF & G cannot deduct Regent Printing's $3000 payment to Gibbs in partial compensation for the loss from USF & G's insurance liability. USF & G responds that Gibbs had a duty to mitigate damages and the $3000 payment was made in mitigation.

 "The collateral source rule provides that a wrongdoer is not entitled to have damages, for which he is liable, reduced by proof that the plaintiff has received or will receive compensation or indemnity for the loss from an independent collateral source." *DuBois v. Nye*, 584 P.2d 823, 825 (Utah 1978) (citations omitted). The independent collateral source is most often the plaintiff's insurer, and the usual role of the collateral source rule is to prevent insurance payments of damages from reducing the wrongdoer's liability. *See Suniland Corp. v. Radcliffe*, 576 P.2d 847 (Utah 1978) (plaintiff's insurance premium was not paid to protect tortfeasor); *Phillips v. Bennett*, 21 Utah 2d 1, 439 P.2d 457 (1968) (insurance payments belong to plaintiff and are not credited to defendant). Thus if Heinz had independently insured the photographs, the collateral source rule would dictate that a payment to Heinz from his insurer would not reduce Gibbs' liability. Here, however, we consider the converse situation. The contested payment comes from a party who could factually be considered a wrongdoer, not an independent collateral source, and the party who stands to benefit from the payment is the insurer, who is not a wrongdoer. The collateral source rule is not helpful where we must decide whether a *wrongdoer's* partial payment of damages diminishes the *insurer's* liability.

 Neither, however, is this a clear case of mitigation of damages. As we stated in *Angelos v. First Interstate Bank of Utah*, 671 P.2d 772, 777 (Utah 1983), "The doctrine of avoidable consequences, also referred to as mitigation of damages, generally operates to prevent one against whom a wrong *has been* committed from recovering any item of damage arising from the wrongful conduct which could have been avoided or minimized by reasonable means." (Emphasis added.)[5] USF & G contends that because Gibbs failed to notify Regent Printing of the value of the photographs or to purchase separate insurance for the shipping, "the doctrine of mitigation of damages and avoidable consequences should trump the collateral source rule." This argument is ineffective because an insured's duty to mitigate commences only when "some damage has occurred, of which [the insured] has knowledge," 46 C.J.S. *Insurance* § 1125 (1993), and thus Gibbs had no preloss duty to mitigate damages.

 The proper doctrine applicable in this case is the insurer's right of subrogation against the wrongdoer. Not only may an insurer seek reimbursement from the wrongdoer for payments previously made to an insured, but "the payment by a tortfeasor for property damage to an insured ordinarily relieves the insurance company from paying therefor." 44 Am.Jur.2d *Insurance* § 1813 (1982). *See generally id.* at §§ 1815–1818. Where the insured has received payment from both the insurer and the wrongdoer, "[t]he general rule is unquestionably that the insurer can recover from the insured, of the sum of insurance paid upon the policy, ... the excess received from the wrongdoer after full compensation for [insured's] loss, including the costs and expenses thereof." *Shawnee Fire Ins. Co. v. Cosgrove*, 86 Kan. 374, 121 P. 488, 489 (1912); *see also* Annotation, *Insurance—Loss Paid by Another* 51

5. For example, a landlord must mitigate a broken lease agreement by reletting the subject property, *Olympus Hills Shopping Ctr. v. Landes*, 821 P.2d 451 (Utah 1991), a wrongfully discharged employee must look for a new job, *Piacitelli v. Southern Utah State College*, 636 P.2d 1063 (Utah 1981), and the aggrieved party in a breach of contract "may not, either by action or inaction, aggravate the injury occasioned by the breach, but has a duty actively to mitigate his damages." *Madsen v. Murrey & Sons Co.*, 743 P.2d 1212, 1214 (Utah 1987).

A.L.R.2d, at 697, § 6, at 712; *Agricultural Ins. Co. v. Utah Light & Traction Co.*, 114 Utah 355, 199 P.2d 567 (1948); *Ortiz v. Great Southern Fire & Cas. Ins. Co.*, 597 S.W.2d 342 (Tex.1980) (insurer can recover excess collected from wrongdoer after insured is fully compensated). Therefore, although USF&G is liable to Gibbs for the sum of the damages it must pay to Heinz plus associated costs and expenses, any payment received in excess of that amount is the rightful property of USF & G.

## VI. DISPUTED ISSUES OF MATERIAL FACT

USF&G contends that there are disputed issues of material fact, arguing (1) that the trial court relied on the doctrine of "reasonable expectations," and (2) that the trial court "went beyond the plain language of the definition of coverage territory to assume extrinsic evidence of intent on the part of USF & G." However, although the trial court discussed the expectations of a purchaser of insurance in its oral ruling, neither its written judgment nor our opinion here relies on the doctrine of reasonable expectations or on extrinsic evidence of intent.

Additionally, USF&G alleges that Gibbs misrepresented material facts during the contract negotiations by failing to inform the insurance company of the publisher's use of subcontractors. Gibbs responds, and the record verifies, that the query "Are subcontractors used?" to which Gibbs responded in the negative, appeared in a 1991 application for workers' compensation insurance rather than on the general commercial liability insurance application. Furthermore, this issue was raised for the first time in USF & G's postjudgment motion to amend its answer to the complaint, which the trial court denied before issuing the written judgment. This appeal is limited to the partial summary judgment that the trial court certified as final under rule 54(b), and therefore, the issue of misrepresentation is not before us.

## CONCLUSION

We affirm, partly on different grounds, the trial court's partial summary judgment that

coverage under USF & G's commercial general liability insurance policy applies to Gibbs' loss of the photographic plates belonging to Heinz. We reverse the award of attorney fees and direct the trial court on remand to determine whether USF & G has breached the implied covenant of good faith and fair dealing and to award or deny fees accordingly. We reverse the trial court's judgment that the collateral source rule applies to the payment that Gibbs received from Regent Printing and direct the trial court to reduce the amount of the judgment accordingly.

Affirmed in part on different grounds, and reversed in part.

STEWART, Associate C.J., and DURHAM, J., concur in Justice HOWE's opinion.

ZIMMERMAN, Chief Justice, dissenting:

I dissent from the result reached by the majority. I would hold that the property damage did not occur in the "coverage territory," which is the United States, its territories and possessions, Puerto Rico, and Canada. I cannot agree that the books had been made or sold at the time of loss. It stretches credulity to argue that because this is one volume of a six-volume set, the whole series is to be seen as the "product." For that reason, I would reverse the trial court and enter judgment for USF & G. Accordingly, I join with the majority in reversing the award of attorney fees. I also join in the majority's reversal of the trial court's judgment that the collateral source rule applied to the payment that Gibbs received from Regent Printing.

RUSSON, J., concurs in Chief Justice ZIMMERMAN's dissenting opinion.