2003 UT 41

**Armand L. SMITH, individually and as trustee for the Armand L. Smith, Jr., Trust and the Shannon S. Windham Trust, and Virginia L. Smith, Plaintiffs and Appellees,**

**v.**

**FAIRFAX REALTY, INC., formerly Price Development Co., a Utah corporation, North Plains Land Co., Ltd., a Utah limited partnership, and North Plains Development Co., Ltd., a Utah limited partnership, Defendants and Appellants.**

No. 20010673.

Supreme Court of Utah.

Oct. 3, 2003.

Rehearing Denied Oct. 29, 2003.

Robert S. Campbell, Clark K. Taylor, Salt Lake City, for plaintiffs.

Harold G. Christensen, Reed L. Martineau, Rex E. Madsen, James S. Jardine,

Brent D. Wride, Rick B. Hoggard, Rod N. Andreason, Salt Lake City, for defendants.

PARRISH, Justice:

¶ 1 This case presents issues relating to the propriety of both compensatory and punitive damage awards. At the conclusion of a jury trial, defendant Price Development Company (Price), a Utah corporation now doing business as Fairfax Realty, Inc., was found liable for conversion, breach of partnership agreements, and breach of fiduciary duties. Plaintiffs Armand and Virginia Smith were awarded compensatory damages, including prejudgment interest, and punitive damages.

¶ 2 On appeal, Price contends that (1) the trial court wrongly denied a directed verdict on the issue of whether Price's actions resulted in any damage to the Smiths; (2) the Smiths were not entitled to prejudgment interest as part of the compensatory damages; (3) the prejudgment interest award was excessive; (4) the trial court erred in submitting the issue of punitive damages to the jury; and (5) the punitive damage award was excessive. We affirm the trial court on all issues except the excessiveness of the prejudgment interest award.

## BACKGROUND

■ ¶ 3 "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict." *Diversified Holdings, L.C. v. Turner,* 2002 UT 129, ¶ 2, 63 P.3d 686 (citation and quotation omitted). In 1984, Price purchased a thirty-three-acre parcel of property in Clovis, New Mexico, from the Smiths. As part of the transaction, the Smiths received a 15% limited partnership interest in each of two partnerships formed to build and operate a shopping mall on the property. Price became the general partner, and the remaining limited partnership interests went to Price and related entities that were under the overall ownership and control of John Price.

¶ 4 Construction of the North Plains Mall was financed through a $9 million loan that was later paid with the proceeds of a $12 million loan. The mall opened in 1985 with approximately forty tenants and thereafter maintained a typical occupancy rate of 93%. Price periodically informed the Smiths that it was pleased with the performance of the mall.

¶ 5 In July 1993, Price informed the Smiths that John Price had decided to form a real estate investment trust (REIT) by pooling shopping malls and other commercial properties owned or controlled by John Price entities. Price wanted to include the North Plains Mall in the REIT and told the Smiths that if the mall were included, the Smiths would have three distinct options for handling their 15% interest in the mall.

¶ 6 Price presented the three options to the Smiths, and the Smiths assumed they had time to consider the options and the potential transfer of the mall. Then, without further communication with the Smiths on the matter, Price proceeded to sign contribution agreements and transfer the mall property into the REIT, despite provisions in the partnership agreements that required the Smiths' consent for such transactions.[1] Preparations were then made to initiate a public stock offering in the REIT.

¶ 7 In the ensuing months, the Smiths repeatedly requested information regarding the status of their interests in the mall, but Price failed to disclose its unilateral decision to contribute the mall property to the REIT. Instead, Price fielded the Smiths' questions regarding the three options previously given to the Smiths, leading them to believe the options were still open, even though Price knew that its unilateral action had left the Smiths with no options. When the Smiths inquired as to the possible value of their holdings should the mall be included in the REIT, Price sent various conflicting estimates, ultimately assigning a total value of just $6,160 to the Smiths' interests. In response, the Smiths presented objections and

---

[1]. The partnership agreements required 90% approval of the limited partners before Price, as the general partner, could assign the property for a "non-partnership purpose." The Smiths held 15% and presented evidence at trial that conveyance of the property into the REIT was not a partnership purpose under the agreement. Price has not contested this point on appeal.

concerns as to the method used for valuing their interests, the proposed uses of proceeds from the sale of stock, and the costs that could be charged against the value of the mall.[2]

¶ 8 In April 1994, Price finally disclosed to the Smiths that Price had decided to transfer the mall to the REIT the previous September and that the three options originally presented to the Smiths were no longer available. In fact, the REIT had actually gone public on January 21, 1994, selling approximately $198,000,000 in stock. Proceeds from the public offering were used to pay existing mortgage debt on John Price properties, purchase equity interests in other property, and pay debts and expenses associated with the REIT offering. Evidence at trial showed that the overall transaction substantially benefitted John Price personally, as well as the Price Development Company.

¶ 9 The Smiths brought suit against Price based on the foregoing events and on evidence that Price had acted in other inappropriate, self-interested ways. These other actions included the commingling of funds of multiple Price-related entities, payment of inflated management fees to a Price subsidiary, payment of interest to itself on its capital call contributions while withholding interest from the Smiths' contributions, and possible manipulation of partnership tax returns to the benefit of Price and to the detriment of the Smiths.

¶ 10 After a fourteen-day trial, the jury reached a verdict in favor of the Smiths, finding that Price had breached the partnership agreements, breached its fiduciary duty to the Smiths, and converted partnership assets. The jury awarded the Smiths $410,000 in compensatory damages, which, according to the evidence at trial, was the fair market value of the Smiths' partnership interests in the mall property at the time of the transfer. The jury added $690,000 to the compensatory amount in prejudgment inter-

est. The jury also awarded punitive damages in the sum of $5,500,000 against Price.

¶ 11 Following the verdict, Price brought a number of post-trial motions, including motions for judgment notwithstanding the verdict and for new trial or, in the alternative, for a remittitur. The trial court denied these motions and entered special findings on the punitive damage award pursuant to *Crookston v. Fire Insurance Exchange*, 817 P.2d 789, 811 (Utah 1991) (directing trial judges to articulate grounds for upholding punitive damages when an award exceeds the range of what has consistently been upheld). The special findings upheld the punitive damage award as being "within the zone of reasonableness given the conduct of Price Development and the circumstances of the case."

## ANALYSIS

### I. DENIAL OF MOTION FOR DIRECTED VERDICT

¶ 12 Price first contends that the district court should have granted its motion for a directed verdict because the Smiths' interests, it argues, were valueless outside of the REIT and Price's actions, therefore, did not result in any damage to the Smiths. "Under Utah law, a party who moves for a directed verdict has the very difficult burden of showing that no evidence exists that raises a question of material fact." *Mahmood v. Ross*, 1999 UT 104, ¶ 18, 990 P.2d 933 (citations and quotation omitted).

> When reviewing any challenge to a trial court's denial of a motion for directed verdict, we review the evidence and all reasonable inferences that may fairly be drawn therefrom in the light most favorable to the party moved against, and will sustain the denial if reasonable minds could disagree with the ground asserted for directing a verdict.

*Id.* at ¶ 16 (citations and quotation omitted). We note here that a more complete marshal-

---

2. Price proposed that $48 million of the money to be raised from the sale of stock in the REIT be used to buy out partnership interests in another mall, with a portion of that expense charged to the North Plains Mall. In addition, approximately $722,000 in fees incident to the formation of the

REIT was to be charged against the value of the mall. The Smiths objected to these items and also contested the use of a "REIT value"—rather than fair market value—for valuing their interests in the mall.

ing of the evidence by Price would have facilitated our review of this issue. *See Moon v. Moon,* 1999 UT App 12, ¶ 24, 973 P.2d 431 (" 'In order to properly discharge the duty of marshaling the evidence, the challenger must present, in comprehensive and fastidious order, every scrap of competent evidence introduced at trial which supports the very findings the appellant resists.' " (quoting *W. Valley City v. Majestic Inv. Co.,* 818 P.2d 1311, 1315 (Utah Ct.App. 1991))).

¶ 13 Price argues that had it not transferred the mall property to the REIT, the mall inevitably would have suffered bankruptcy or foreclosure and the Smiths would have recovered nothing for their partnership interests. To this end, Price presented evidence that the mall's $12 million loan, which had been extended six times, had to be repaid by July 15, 1994. According to Price, there were insufficient resources to pay the approximately $11 million balance on the loan by this date, and foreclosure or bankruptcy was therefore imminent. Price also presented evidence that prior to the transfer, which occurred in the fall of 1993, it had made various unsuccessful attempts to refinance or sell the mall, thereby rendering the transfer to the REIT the only viable option. Price argues that this evidence demonstrates that the Smiths could not have received any value for their shares outside of the REIT.[3]

¶ 14 The Smiths argue that financial failure of the mall was neither inevitable nor imminent. They presented evidence that the outstanding loan could have been extended again as it had been in the past and that Price's efforts to refinance or· sell the mall were not exhausted. The Smiths also produced evidence that Price and John Price had strong financial incentives to contribute the mall to the REIT, rather than committing to sell it on the market. Finally, the Smiths used the testimony of an appraiser to show that their partnership interests had a significant fair market value.

■ ¶ 15 Reviewing the evidence presented by each side and the inferences reasonably drawn therefrom in the light most favorable to the Smiths, we find sufficient evidence to raise a question of material fact on the issue of the mall's valuation. Reasonable minds could disagree as to whether the Smiths' interests in the mall had value outside of the REIT and therefore whether the Smiths were damaged by Price's breach of contract, breach of fiduciary duty, and conversion. Therefore, the district court appropriately denied Price's motion for a directed verdict.

## II. PREJUDGMENT INTEREST

■ ¶ 16 Price argues that the trial court improperly allowed an award of prejudgment interest in this case. "A trial court's decision to grant or deny prejudgment interest presents a question of law which we review for correctness." *Cornia v. Wilcox,* 898 P.2d 1379, 1387 (Utah 1995) (citations omitted).

■ ¶ 17 As established nearly a century ago in *Fell v. Union Pacific Railway Co.,* Utah courts award prejudgment interest in cases where "damages are complete" and can be measured by "fixed rules of evidence and known standards of value." 32 Utah 101, 88 P. 1003, 1007 (1907); *see also Cornia,* 898 P.2d at 1387; *Bjork v. April Indus. Inc.,* 560 P.2d 315, 317 (Utah 1977). In the present case, the trial judge permitted an award of prejudgment interest based not on the test set forth in *Fell,* but on a prejudgment interest principle recognized in various jurisdictions in breach of fiduciary duty cases.

¶ 18 Some jurisdictions apply the rule that a fiduciary who breaches his duties should not be allowed to benefit from his misconduct and therefore must account for interest on any money or property the fiduciary misappropriated.[4] Following this principle, the tri-

---

**3.** Price uses the case of *Mahmood v. Ross,* 1999 UT 104, 990 P.2d 933, to characterize this issue as one of proximate causation. The present case, unlike *Mahmood,* does not involve a lengthy or attenuated sequence of events leading to the injury for which the Smiths seek to recover. The issue in this case is more accurately characterized as one involving valuation rather than causation.

**4.** *See, e.g., Josephson v. Marshall,* 2002 WL 1315604, at *4, 2002 U.S. Dist. LEXIS 10741, at *12 (S.D.N.Y. June 14, 2002) (applying New York law); *McDermott v. Party City Corp.,* 11 F.Supp.2d 612, 633 (E.D.Pa.1998) (applying

al judge instructed the jury that if Price were found liable for breach of fiduciary duty, the Smiths would be entitled to an interest award measured from the date of the breach.

¶ 19 This court has never decided whether to adopt the principle that prejudgment interest is always appropriate in breach of fiduciary cases. We need not make the decision in this case, however, because we find that the prejudgment interest awarded was appropriate under the *Fell* standard.

[7] ¶ 20 In *Fell,* this court stated:

The true test to be applied as to whether interest should be allowed before judgment in a given case or not is, therefore, not whether the damages are unliquidated or otherwise, but whether the injury and consequent damages are complete and must be ascertained as of a particular time and in accordance with fixed rules of evidence and known standards of value, which the court or jury must follow in fixing the amount, rather than be guided by their best judgment in assessing the amount to be allowed for past as well as for future injury, or for elements that cannot be measured by any fixed standards of value.

88 P. at 1007.[5] Thus, we do not require that damages necessarily be liquidated, but we deny awards of prejudgment interest in cases where damage amounts are to be determined by the broad discretion of the jury. "In all personal injury cases,[6] cases of death by wrongful act, libel, slander, false imprisonment ... and all cases where the damages are incomplete and are peculiarly within the province of the jury to assess at the time of the trial, no interest is permissible." *Id.* at 1006.

¶ 21 This court concluded, in two of the first cases interpreting *Fell,* that fair market valuations of real property are within the category of damages upon which prejudgment interest may properly be awarded. *See San Pedro, Los Angeles & Salt Lake R.R. Co. v. Bd. of Educ.,* 35 Utah 13, 99 P. 263 (1909); *Kimball v. Salt Lake City,* 32 Utah 253, 90 P. 395 (1907). Both *San Pedro* and *Kimball* involved damages in the form of diminution of value to real property. In *San Pedro,* a railroad company reduced the value of school property by its plan to construct a railroad track adjacent to the property. In *Kimball,* a city reduced the value of a residential property by changing the street grade in front of the property. In both cases, the jury was asked to determine the amount of diminution in the fair market value of the relevant property based on the evidence presented. Prejudgment interest was then allowed on the fair market value of the diminution.

¶ 22 Similarly, in the present case, damages resulted from the loss of plaintiffs' interest in a piece of real property—the North Plains Mall—and assessing the amount of loss involved a fair market valuation of the property. Hence, the language from *San Pedro* is applicable:

We, therefore, have a case in which, for the purpose of fixing damages, the injury is complete; the damages are ascertained by the ordinary rules of evidence and according to a known standard or measure of value. And all this must be determined from competent evidence, which is binding

---

Pennsylvania law); *Nordahl v. Dep't of Real Estate,* 48 Cal.App.3d 657, 121 Cal.Rptr. 794, 798–99 (1975); *In re Estate of Wernick,* 151 Ill.App.3d 234, 104 Ill.Dec. 486, 502 N.E.2d 1146, 1154 (1986), *rationale aff'd,* 127 Ill.2d 61, 129 Ill.Dec. 111, 535 N.E.2d 876 (1989); *see also* Restatement of Restitution §§ 156, 157 (1937).

**5.** In later Utah cases, the test has been recited as follows:

Where the damage is complete and the amount of the loss is fixed as of a particular time, and that loss can be measured by facts and figures, interest should be allowed from that time ... and not from the date of judgment. On the other hand, where the damages are incomplete

or cannot be calculated with mathematical accuracy, such as in the case of personal injury, wrongful death, defamation of character, false imprisonment, etc., the amount of the damages must be ascertained and assessed by the trier of fact at the trial, and in such cases prejudgment interest is not allowed.

*Cornia,* 898 P.2d at 1387; *Consolidation Coal Co. v. Utah Div. of State Lands & Forestry,* 886 P.2d 514, 523–24 (Utah 1994); *Bjork,* 560 P.2d at 317.

**6.** Utah Code Ann. § 78-27-44 (2002) creates a statutory right to prejudgment interest on special damages in personal injury cases.

upon both the court and jury. The jury, therefore, only had a right to exercise their judgment within the limits of the evidence upon the question of value. It is not a case where it was left to the jury to determine the amount of damages from a mere description of the wrongs done or injuries inflicted whether to person, property or reputation.

99 P. at 267.

¶ 23 Where, as here, damages were complete as of the day the property was transferred to the REIT and the jury based its award of damages on competent testimony from an appraiser who used generally accepted principles in determining the market value of the real property, an award of prejudgment interest is appropriate. The fact that the parties disputed the value of the property at trial does not change our conclusion that the jury's determination of the property's value was "ascertained . . . in accordance with fixed rules of evidence and known standards of value." *Fell*, 88 P. at 1007.[7] Therefore, we uphold the trial court's decision to award prejudgment interest.[8]

### III. EXCESSIVENESS OF THE PREJUDGMENT INTEREST AWARD

¶ 24 Having upheld the trial court's decision to award prejudgment interest, we now decide whether the trial judge erred in denying a new trial or remittitur on the amount of prejudgment interest awarded. Following the jury's verdict, Price attacked the compensatory award under rule 59(a)(5) and (6) of the Utah Rules of Civil Procedure, contending that the prejudgment interest component of the compensatory award was ex-

cessive and not supported by the evidence presented at trial. Under rule 59(a), a trial judge may grant a new trial or remittitur of damages when, inter alia, there are "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice," or there is an "[i]nsufficiency of the evidence to justify the verdict or other decision." Utah R. Civ. P. 59(a)(5)-(6) (2003); *see also Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 802–03 (Utah 1991).

¶ 25 We apply an abuse of discretion standard in reviewing a trial judge's decision to grant or deny a new trial or remittitur on the amount of compensatory damages. *Crookston*, 817 P.2d at 803–05 (distinguishing between the trial court's direct review of a jury's award under rule 59 and the appellate court's subsequent review of the trial court's actions). "Under our rule 59, it is well settled that, as a general matter, the trial court has broad discretion to grant or deny a motion for a new trial." *Id.* at 804 (citations omitted). Under this standard of review, "we will reverse only if there is no reasonable basis for the decision." *Id.* at 805.

¶ 26 Through the use of an expert witness, the Smiths presented detailed interest calculations at trial reflecting an interest amount due of $597,221. The interest rate used by the Smiths' accounting expert to calculate the interest due the Smiths was apparently derived from the partnership agreements. *See* Utah Code Ann. § 15-1-1(2) (2002) (setting the legal interest rate at 10% per annum or, alternatively, any rate agreed upon by the parties). The jury, however, awarded $690,000 in prejudgment interest.[9] Because we find no evidence in the

---

7. Two Utah Court of Appeals decisions have held that fair market valuations are too "inherently uncertain" to support prejudgment interest awards. *Klinger v. Kightly*, 889 P.2d 1372, 1381 (Utah Ct.App.1995); *Price–Orem Inv. Co. v. Rollins, Brown, & Gunnell, Inc.*, 784 P.2d 475, 483 (Utah Ct.App.1989). These decisions are inconsistent with the interpretation of *Fell* set forth in *San Pedro* and *Kimball*, which we follow today. We further note that fair market valuations of real property have long been relied on for prejudgment interest awards in the context of condemnation proceedings. *See* Utah Code Ann. § 78–34–11 (2003).

8. " '[W]e may affirm a trial court's decision on any proper ground(s), despite the trial court's having assigned another reason for its ruling.' " *Gibbs M. Smith, Inc. v. United States Fid. & Guar. Co.*, 949 P.2d 337, 342 n. 3 (Utah 1997) (quoting *Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988)).

9. We note that in many cases, where the interest rate to be applied is straightforward and the necessary calculations are free of factual complexity, the amount of prejudgment interest to be awarded may be a question reserved for, and entered by, the trial judge instead of the jury. In

record to support the jury's addition of nearly $100,000 to the figures calculated by the Smiths' expert, we hold that the trial court's denial of remittitur constituted an abuse of discretion. Accordingly, we remit the prejudgment interest award to $597,221.[10]

## IV. SUBMISSION OF PUNITIVE DAMAGES TO THE JURY

■■■ ¶ 27 Price contends that the district court erred in submitting the option of punitive damages to the jury. In Utah, punitive damages are available only upon clear and convincing proof of "willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of others." Utah Code Ann. § 78–18–1(1)(a) (2002); *Behrens v. Raleigh Hills Hosp., Inc.,* 675 P.2d 1179, 1186 (Utah 1983). "While simple negligence will not support punitive damages, negligence manifesting a knowing and reckless indifference toward the rights of others will." *Diversified Holdings, L.C. v. Turner,* 2002 UT 129, ¶ 29, 63 P.3d 686.

■■ ¶ 28 Having reviewed the record in the light most favorable to the Smiths, we find that there is more than sufficient evidence to support the court's submission of the punitive damages question to the jury.[11] Price's actions display an intentional disregard of the Smiths' rights and of its fiduciary obligations. The court thus appropriately allowed the jury to evaluate the evidence and determine whether punitive damages were merited.

this case, the partnership agreements set a floating rate dependent upon the prime rate calculated by a particular bank and adding two percentage points, which was apparently the rate used by the Smiths' expert in his calculations. Because the determination of such a rate requires factual inquiry, the interest calculations in this case were appropriately treated as a matter open to evidence.

10. Courts may offer a remittitur of damages as an alternative to a new trial. The party against whom the rule 59(a) motion is brought may either accept the amount of damages that the court considers justified or submit to a new trial on the issue. *See Crookston,* 817 P.2d at 803–04;

## V. EXCESSIVENESS OF THE PUNITIVE DAMAGE AWARD

¶ 29 Price also challenges the punitive damage award for excessiveness, although the legal basis for Price's challenge is somewhat unclear. The Smiths argue that Price has not explicitly challenged the award on constitutional grounds and that our review of the award should therefore be limited to the issue of whether the trial judge abused his discretion in denying Price's motion for a new trial under rule 59(a)(5) of the Utah Rules of Civil Procedure on the basis that the punitive damages awarded were excessive. In response, Price argues that it has, in fact, mounted a constitutional challenge to the award and that, in any event, this court must conduct a de novo review of the excessiveness of the award.

■■ ¶ 30 Although Price characterizes its challenge to the award of punitive damages as a federal constitutional challenge, Price did not brief the factors that the United States Supreme Court has enunciated for evaluating whether an award of punitive damages is excessive under the Due Process Clause of the U.S. Constitution. *See BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Price focuses only on the *Crookston* factors, which were enunciated by this court in the context of a rule 59 motion for new trial on the grounds of excessive damages. *Crookston,* 817 P.2d at 801–03. Because Price failed to adequately brief the excessiveness issue as a federal constitutional challenge, we evaluate the punitive damage award for excessiveness under the *Crookston* factors.[12]

*see also Diversified Holdings, L.C. v. Turner,* 2002 UT 129, ¶ 9 n. 2, 63 P.3d 686; *accord* 11 Charles Alan Wright, Arthur. R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2815 (2d ed.1995).

11. *See* Background, *supra,* and part V, *infra.*

12. This court is not obligated to address issues that are not adequately briefed. *State v. Gomez,* 2002 UT 120, ¶ 30, 63 P.3d 72 ("We do not reach Gomez's argument that the trial court denied him his right to due process or a fair trial because those constitutional claims were not adequately briefed."); *Smith v. Four Corners Mental Health Ctr., Inc.,* 2003 UT 23, ¶ 46, 70 P.3d 904

¶ 31 Although we evaluate the excessiveness of the punitive award under the *Crookston* factors, we note that the *Crookston* factors share at least some similarities with the *Gore* factors, which are used in evaluating a federal constitutional challenge. *See infra* notes 13 and 16 and accompanying text. We note also that this court has adopted a de novo standard for reviewing jury and trial court conclusions under the *Crookston* factors. *See Diversified Holdings*, 2002 UT 129 at ¶ 5, 63 P.3d 686; *Campbell v. State Farm Mut. Auto. Ins. Co.*, 2001 UT 89, ¶ 13, 65 P.3d 1134 (*Campbell I*), *rev'd on other grounds*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).[13] Accordingly, Price's failure to brief excessiveness as a federal constitutional issue does not alter the applicable standard of review. *See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (holding that federal due process requires de novo review of punitive damage awards appealed on constitutional grounds).

¶ 32 In *Crookston*, this court enunciated seven factors to be analyzed in evaluating whether a punitive damage award is excessive:

(i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrences of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded.

817 P.2d at 808. We will now examine each of these factors.

*A. The Relative Wealth of Price*

¶ 33 We first consider Price's wealth.

Our cases have determined that a defendant's wealth can be either an aggravating or a mitigating factor in determining the size of a punitive damage award, since punitive damages should be tailored to what is necessary to deter the particular defendant, as well as others similarly situated, from repeating the prohibited conduct.

*Diversified Holdings*, 2002 UT 129 at ¶ 15, 63 P.3d 686; *see also Campbell I*, 2001 UT 89 at ¶ 23, 65 P.3d 1134. In making this assessment, some courts have compared a punitive damage award with a company's net worth. *See, e.g., Cash v. Beltmann N. Am. Co.*, 900 F.2d 109, 111 n. 3 (7th Cir.1990); *Campbell I*, 2001 UT 89 at ¶ 23, 65 P.3d 1134. The Seventh Circuit Court of Appeals has held that a typical punitive damage award may be around one percent of the defendant's net worth. *Cash*, 900 F.2d at 111 n. 3. We have emphasized that although such guidelines may be helpful, "in Utah there is no pre-established mathematical formula for such awards." *Campbell I*, 2001 UT 89 at ¶ 23, 65 P.3d 1134.

¶ 34 Price Development Company was a large owner and operator of commercial shopping malls and retail properties in the intermountain states. Its chairman and CEO, John Price, owned 99.99% of the company. In the court below, Price Development Company's total wealth was found to be in excess of $37 million. This amount was determined after attempting to overcome the obstacles associated with commingled funds and the highly interrelated ownership and operations of various John Price entities,

("[W]e are not 'a depository in which [a party] may dump the burden of argument and research.' " (quoting *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998))); *accord Freund v. Nycomed Amersham*, 326 F.3d 1070, 1079 n. 10 (9th Cir.2003) (holding that the right to constitutional review of a punitive damage award may be "waived or forfeited like many other constitutional rights").

13. In *Campbell I*, this court adopted a de novo standard of review for reviewing whether punitive damages are excessive under state law (the *Crookston* analysis). This was done apparently as a matter of judicial economy, *see Campbell I*,

2001 UT 89, ¶ 13, 65 P.3d 1134, in light of the fact that review of a punitive award under federal due process standards requires a de novo standard of review. *See Gore*, 517 U.S. 559, 116 S.Ct. 1589. A de novo standard for reviewing punitive awards under state law is also more consistent with the U.S. Supreme Court's decision in *Honda Motor Co. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994) (holding that Oregon law, which granted trial courts great deference in reviewing the excessiveness of punitive awards, violated the defendants' rights to due process under the U.S. Constitution).

each of which had substantial assets. With Price Development Company valued at $37 million, the $5.5 million punitive damage award represents approximately 15% of the company's wealth. An analysis of the remaining *Crookston* factors will aid us in determining whether this percentage renders the award excessive under the facts of this case.

### B. The Nature of Price's Misconduct

¶ 35 This factor requires us to analyze Price's misconduct in terms of "maliciousness, reprehensibility, and wrongfulness." *Campbell I*, 2001 UT 89 at ¶ 27, 65 P.3d 1134. It parallels the "reprehensibility" factor described by the United States Supreme Court in *Gore*[14] and recognizes that certain wrongdoings are more egregious and blameworthy than others so as to justify larger awards. *See Campbell I*, 2001 UT 89 at ¶ 27, 65 P.3d 1134; *Gore*, 517 U.S. at 575–76, 116 S.Ct. 1589. "Deliberate false statements, acts of affirmative misconduct, [and] concealment of evidence of improper motive" support more substantial awards, *Gore*, 517 U.S. at 579, 116 S.Ct. 1589, as do acts involving "trickery and deceit." *Id.* at 576, 116 S.Ct. 1589; *Campbell I*, 2001 UT 89 at ¶ 32, 65 P.3d 1134. The United States Supreme Court has also stated that "economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." *Gore*, 517 U.S. at 576, 116 S.Ct. 1589.[15]

¶ 36 In this case, the jury found Price liable for breach of its fiduciary duty to the Smiths, breach of partnership agreements, and conversion of partnership assets. Along with the verdict, the trial court entered special findings stating that "the jury could have found by clear and convincing evidence a pattern of deceit, failure to disclose and misrepresentation." In particular, the court detailed Price's prolonged, deliberate failure to inform the Smiths of the execution of the contribution agreements and the resulting unavailability of the three options that Price originally gave the Smiths regarding how their interests could be handled in the REIT transaction. The court also detailed Price's conflicting and "intentionally misleading" calculations of the value of the Smiths' interests in the mall property in the REIT. The calculations given to the Smiths differed significantly from the company's own calculations, which the company did not reveal until six years of litigation had ensued. Additionally, the court detailed Price's acts of financial misconduct, including payment of excessive fees to itself as general partner, commingling funds from different Price-owned properties, and accruing interest to itself on its own capital contributions while denying the Smiths interest on their contributions.

¶ 37 We agree with the trial court that Price's actions amount to affirmative misconduct showing deliberate misrepresentation and disregard of the rights of the Smiths. Price's actions accordingly support a substantial award of punitive damages.

### C. Facts and Circumstances Surrounding Price's Misconduct

¶ 38 "This factor looks to the circumstances surrounding the illegal conduct, particularly with respect to what the defendant knew and what was motivating his or her actions." *Campbell I*, 2001 UT 89 at ¶ 35, 65 P.3d 1134. Throughout the creation of the REIT, Price was aware of its fiduciary obligations to the Smiths and of the consent clause written into the partnership agreements. Price consciously disregarded its obligations.

¶ 39 Price argues that the motivation for its actions was to benefit the Smiths and everyone involved in the REIT transaction.

---

**14.** The *Crookston* factors that consider the nature of a defendant's misconduct, the facts and circumstances surrounding the defendant's misconduct, and the probability of future recurrences (recidivism) are subsumed in the "reprehensibility" guidepost established in *Gore* as part of the federal punitive damage excessiveness analysis. *See Gore*, 517 U.S. at 575–80, 116 S.Ct. 1589; *Campbell I*, 2001 UT 89 at ¶¶ 27, 53, 65 P.3d 1134.

**15.** "Behaviors that undermine the efficiency and integrity of the judicial process may also be considered under the rubric of the second [*Crookston*] factor." *Diversified Holdings*, 2002 UT 129 at ¶ 17, 63 P.3d 686.

Price also reasserts that its actions were necessary to save the mall from foreclosure. However, the evidence presented at trial (and not fully marshaled by Price in its brief) was that Price, John Price, and the Price-related entities making up the general partnership all had significant financial incentives to carry out the REIT transaction. These incentives included repayment to Price of $27 million of loans made to the Price-related malls, acquisition of stock holdings in the REIT, elimination of $94 million of John Price's personal guarantees on existing loans for the mall and other properties, and deferral of federal income tax consequences.

¶ 40 With respect to Price's failure to disclose its dealings with the partnership property to the Smiths, Price asserts without elaboration that it avoided responding to the Smiths' inquiries on the advice of legal counsel. As noted by the trial court, substantial evidence was presented at trial that Price did not want the Smiths to interfere with the REIT's formation by filing an adverse claim or a lawsuit prior to January 1994 when the REIT went public. Thus, Price's self-interested actions, made in the face of known fiduciary obligations, support a substantial punitive damage award.

### D. Effect of Price's Misconduct on the Smiths and Others

¶ 41 This factor requires us to analyze the actions of Price in terms of their impact on the Smiths and others. Price's misconduct caused the Smiths to lose their partnership interests in the mall. Although this loss was significant, it does not appear from the evidence that it had a "devastating impact" on the Smiths. Nor did Price's actions have a "widespread effect on groups of vulnerable victims." *Diversified Holdings,* 2002 UT 129 at ¶ 20, 63 P.3d 686; *Campbell I,* 2001 UT 89 at ¶ 37, 65 P.3d 1134 ("The larger the number of people affected, the greater the justification for higher punitive damages."). Therefore, this factor individually does not support a sizeable punitive damage award.

### E. Probability of Future Recurrences

¶ 42 "This factor analyzes the likelihood that the defendant will repeat or continue engaging in its wrongful behavior. A high probability of recidivism justifies a higher than normal punitive damage award." *Campbell I,* 2001 UT 89 at ¶ 41, 65 P.3d 1134 (citing *Gore,* 517 U.S. at 577, 116 S.Ct. 1589). Price argues that the REIT transaction was a one-time occurrence for the company so that future misconduct under the same circumstances is not foreseeable. The unlikelihood of a future REIT formation, however, does not bar the possibility of future misrepresentations and breaches of duty similar to those of this case. On the other hand, the record does not contain evidence of a pattern of regular deceit or other comparable acts perpetuated by Price in other business dealings or with other parties. *See TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 462 n. 28, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (noting that courts should look to " 'the existence and frequency of similar past conduct' " (quoting *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21–22, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991))).

### F. Relationship of the Parties

¶ 43 "This factor analyzes the relationship between the parties, looking particularly at the degree of confidence and trust placed in the defendant." *Campbell I,* 2001 UT 89 at ¶ 44, 65 P.3d 1134. The fiduciary relationship of a general partner to a limited partner is one of loyalty, trust, disclosure, and confidence, calling for the utmost good faith and permitting no unfair benefits to the general partner as against the limited partner. We have stated in past cases that a breach of fiduciary relationship can support a large punitive damage award. *Id.; Diversified Holdings,* 2002 UT 129 at ¶ 23, 63 P.3d 686.

¶ 44 Price failed as a fiduciary to deal fairly with the Smiths and their partnership interests. The trial court noted in its special findings that, in addition to other inappropriate actions, Price failed to advise the Smiths of the potential conflicts of interest it had in forming the REIT with other Price-related entities. Price also disregarded the consent clause in the partnership agreements which, according to testimony in the record, was drafted in recognition of the Smiths' vulnerability within the partnership structure. The

Smiths rightly expected a greater degree of candor and loyalty than they received. This factor weighs strongly in favor of a substantial punitive damage award.

### G. Ratio of Punitive to Compensatory Damages

¶ 45 The ratio of punitive to compensatory damages is the final factor for our consideration. This court has not established an absolute ceiling for the ratio of a damages award,[16] and a high ratio is not by itself determinative of excessiveness. *Diversified Holdings*, 2002 UT 129 at ¶ 24, 63 P.3d 686; *Campbell I*, 2001 UT 89 at ¶ 49, 65 P.3d 1134. However, the amount of a punitive damage award must bear a "reasonable and rational relationship" to the actual damages. *Crookston*, 817 P.2d at 810. "[A]n award that falls outside certain parameters will ... elicit more searching judicial scrutiny." *Diversified Holdings*, 2002 UT 129 at ¶ 24, 63 P.3d 686. We have stated as a matter of flexible guideline that for "punitive awards of less than $100,000 a ratio of three to one will generally be justifiable, but for awards greater than $100,000, a somewhat lower ratio is usually appropriate." *Id.*

¶ 46 The United States Supreme Court recently scrutinized punitive damage awards under federal due process standards. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (*Campbell II*). In discussing the issue of ratios between compensatory and punitive awards, the Court cited previous decisions in which it had noted that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* at 1524 (citing *Haslip*, 499 U.S. at 23–24, 111 S.Ct. 1032). While declining to adopt a rigid benchmark that a punitive damage award may not surpass, the Court instructed that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." [17] *Id.* "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution...." *Id.*

¶ 47 In the present case, the jury awarded the Smiths $5.5 million in punitive damages and $1.1 million in compensatory damages, producing a 5 to 1 ratio. We have already reduced the compensatory award, however, to $1,007,221 by remitting the amount awarded as prejudgment interest. The ratio resulting from this reduction is approximately 5.5 to 1, well within the single-digit ratio discussed by the Supreme Court in *Campbell II*.

¶ 48 Having concluded our assessment of the case under the *Crookston* factors, we find that Price's intentionally deceptive business dealings with individuals to whom it owed a fiduciary duty were sufficient to support a $5.5 million punitive damage award. We therefore uphold the punitive damages as awarded by the trial court. We believe that the evidence in the record and our overall analysis support an award of this amount as a serious reprimand for Price's actions to deter future misconduct.

### CONCLUSION

¶ 49 We affirm (1) the trial court's denial of a directed verdict in Price's favor, (2) the trial court's decision to award prejudgment interest (on alternate grounds), (3) the trial court's submission of the issue of punitive damages to the jury, and (4) the jury's award of $5.5 million in punitive damages. We remit the award of prejudgment interest from $690,000 to $597,221 to more accurately reflect the evidence presented by the Smiths' accounting expert at trial. The Smiths are further entitled to an award of reasonable costs and attorney fees as required by the partnership agreements. We remand to the

---

16. "[S]trict dollar amount, percentage of defendant's wealth, and ratio ceilings would allow potential defendants to calculate their exposure to liability in advance, thus diminishing the deterrent effect of punitive damages." *Crookston*, 817 P.2d at 809.

17. The ratio of punitive to compensatory damages is the second guidepost within the federal *Gore* analysis. 517 U.S. at 580, 116 S.Ct. 1589.

district court for a determination of the proper amount of the award.[18]

¶ 50 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice NEHRING, and Judge MAETANI concur in Justice PARRISH's opinion.

¶ 51 Having disqualified himself, Justice WILKINS does not participate herein; District Judge HOWARD H. MAETANI sat.

---

18. The trial court awarded the Smiths reasonable costs and attorney fees pursuant to the terms of the partnership agreements, which provide: "In the event of any legal proceeding involving the interpretation or enforcement of the rights or obligations of the Partners hereunder, the prevailing party or parties shall be entitled to recover its reasonable attorneys' fees and costs." The Smiths have requested costs and attorney fees incurred in this appeal, and Price has not challenged the request. We therefore award the Smiths reasonable attorney fees and costs for this appeal. *Centurian Corp. v. Cripps*, 624 P.2d 706, 713 (Utah 1981) (granting prevailing party's request for attorney fees pursuant to contractual agreement and remanding for determination of amount).